IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

        CR 13-3140 JH

LEHABIM ULISES MORENO-RUBIO

        Defendants.

## DEFENDANT'S MOTION TO SUPPRESS

COMES NOW Defendant Lehabim Ulises Moreno-Rubio, through his attorney John F. Robbenhaar, Assistant Federal Public Defender, and pursuant to the Fourth Amendment to the United States Constitution moves this Court to suppress the following:

1. All physical evidence seized by the DEA from Mr. Moreno-Rubio on September 8, 2013 at the Greyhound Bus Station in Albuquerque, New Mexico;

2. Any statements given by the Defendant to the DEA on September 8, 2013;

3. All evidence gained directly or indirectly as a result of the evidence illegally obtained on September 8, 2013.

The Assistant United States Attorney Dave Walsh opposes the relief requested herein. The Defendant requests that the Court schedule an evidentiary hearing on this motion.

INTRODUCTION

The Court should suppress all of the fruits of the illegal search and seizure that occurred on September 8, 2013 at the Greyhound Bus Terminal in Albuquerque, New Mexico. Drug Enforcement Agency Special Agent Jarrell Perry and Albuquerque Police Department Task Force Detective John Walsh of the Albuquerque Police Department seized Mr. Moreno after

unconstitutional searches of Mr. Moreno's luggage, in the absence of voluntary consent.  SA Perry claims that Mr. Moreno provided consent to the search of his bag, and that pursuant to that consent SA Perry located approximately one (1) kilo of heroin inside Mr. Moreno's duffel.  Mr. Moreno states that SA Perry physically manipulated and/or pre-searched his bag, when Mr. Moreno and other passengers and employees were off the bus, thereby obviating any consent later provided.

On September 8, 2013, in the early morning hours, SA Perry and Officer Walsh were working drug interdiction at the Greyhound Bus Terminal in Albuquerque, New Mexico.  They were awaiting the eastbound bus that was scheduled to arrive shortly after 3:00 am, traveling through Gallup, New Mexico from Phoenix, Arizona, but which was delayed and didn't arrive until shortly after 5:00 am.  SA Perry and Officer Walsh were dressed in street clothes and ball caps, and were waiting at the bus station for the arrival of the bus.[1]

As is the custom at layovers in Albuquerque, once the bus arrives, passengers are asked to disembark and wait in the terminal area while the bus undergoes necessary fueling, cleaning, and other necessary service.  Passengers are encouraged to leave their carry-on luggage on-board.  Layovers in Albuquerque generally last about an hour.

In the present case, the eastbound Greyhound bus from Phoenix‒via‒Gallup arrived at the Albuquerque station at 5:13 am.  SA Perry and Officer Walsh are observed near the newly

---

[1] SA Perry and Officer Walsh are documented to have been at the Greyhound Bus station at 5:15 a.m, but were likely there much earlier.  The chronology of events is obtained from surveillance video produced to the defense by Greyhound Lines, Inc. in discovery.  Images embedded in this motion are taken from that surveillance video.  Times are approximate, and reflect the time-stamp from the respective video camera.

arrived bus, observing the passengers and conferring with Greyhound employees.   Officer Walsh is then seen walking away from the bus.   See Photo 1.   SA Perry remains near the bus and confers with Greyhound employees.   See Photo 2.   After all passengers have disembarked, the bus was moved from the loading area to the wash bay area, where Greyhound employees perform the afore-mentioned fueling, cleaning, and general service.



*Photo: 1 LOADING DOCK 0300-0530_02, CAM 15, 05:19:13*



*Photo: 2 LOADING DOCK 0300-0530_2, CAM 14, 05:20:25*

At 5:40 am, SA Perry enters the wash bay, which is located in a building into which the bus is driven and parked. SA Perry stands next to a small cabinet upon which appear clipboards and papers.   About ninety seconds later, the Greyhound bus enters the wash bay, followed shortly thereafter by Officer Walsh on foot.   Immediately and without conferring with any Greyhound employees, SA Perry opens the rearmost cargo bin.   See Photo 3.   Over the course of the next eight minutes or so, both he and Officer Walsh climb into the cargo bins to, presumably, inspect luggage.   See Photo 4.   Both officers pull numerous bags off the bus and, ultimately, remove five bags from the bus to an unknown location, off-camera. See Photo 5.   The officers kept the five bags off-camera for over 11 minutes, after which they return them to the cargo bins.



*Photo: 3 WASH BAY 0530-0800, CAM 16, 05:42:09*



*Photo: 4 WASH BAY 0530-0800, CAM 16, 05:44.12*

At approximately 5:58 am, SA Perry returns on camera





*Photo: 5 WASH BAY 0530-0800, CAM 16, 05:51:26*

*Photo: 6 WASH BAY 0530-0800, CAM 16, 05:58:45*

*Photo: 7 WASH BAY 0530-0800, CAM 16, 05:58:47*

to the wash bay, and points at the employee to prompt a hands-up, "I didn't see anything" response. See Photos 6; 7. After placing the five bags back inside the cargo bins, SA Perry signals to a Greyhound employee that nothing was found during these off-camera searches of passenger luggage. See Photo 8.



*Photo: 8 WASH BAY 0530-0800, CAM 16, 06:00:28*

For the next 15 minutes or so, SA Perry and Officer Walsh open and enter other cargo bins and physically inspect and handle other luggage. The bus is then pulled forward in the wash bay where workers physically clean the exterior of the bus. SA Perry at this point has a paper in hand, and appears to cross-reference bags to the information on the paper, as if he's looking for a particular bag. See Photo 9. Not having found what they were looking for, SA Perry and Officer Walsh confer. See Photo 10. The two officers then wait by the door of the bus. At this point, after an employee exits the bus, SA Perry and Officer Walsh enter the passenger compartment of the bus.



*Photo: 9 WASH BAY 0530-0800, CAM 16, 06:05:51*



*Photo: 10 WASH BAY, 0530-0800, CAM 16, 06:06:47*

4

See Photo 11. Once they have climbed aboard, the door is closed behind them. At one point, an employee briefly opens the door to place a clipboard with paperwork inside, but the door is again immediately closed and the scrubbing and power washing process is undertaken. SA Perry and Officer Walsh remain aboard, alone in the passenger compartment, for at least ten minutes, at which time the cleaning process is completed and the bus is driven back to the loading area. See Photo 12.


*Photo: 11 WASH BAY 0530-0800, CAM 14, 06:16:24*


*Photo: 12 WASH BAY 0530-0800, CAM 16, 06:26:56*

It is unknown how long SA Perry and Officer Walsh remain on the bus, as the next video sequence from the loading area shows the newly−cleaned and −serviced bus arriving and two Greyhound employees exiting. Less than two minutes later, SA Perry and Officer Walsh are seen boarding the bus anew, this time behind a Greyhound employee. See Photo 13. One can discern the shapes of SA Perry and Officer Walsh aboard the fully−lit bus, positioning themselves for the imminent arrival of the passengers. See Photo 14. It is clear that SA Perry remains in the rear of the bus, while Officer Walsh positions himself toward the front. Passengers then begin to reboard.[2]


*Photo: 13 LOADING DOCK 0530-0800, CAM 14, 06:34:54*

---

[2] One is better able to discern SA Perry and Officer Walsh by their movements on the video, and rather than relying upon the images embedded in this document, undersigned counsel encourages the Court to view the video to better understand the actions of SA Perry and Officer Walsh. By watching the video in question here−Loading Dock 0530-0800, CAM 14, 06:35:10-35, it is evident that the two individuals aboard are Perry and Walsh, and just prior to the



*Photo: 14 LOADING DOCK, 0530-0800_01, 06:35:16*

When Mr. Moreno re-entered the bus, he immediately saw Officer Walsh near the front of the bus and, shortly thereafter, noticed SA Perry standing near his seat in the rear. As he approached his seat, Mr. Moreno observed SA Perry inquiring of other passengers if they knew who owned a particular bag. SA Perry contacted Mr. Moreno and asked if he could speak to him. After Mr. Moreno consented to speak to SA Perry, SA Perry requested and received permission to search Mr. Moreno's small backpack, located on the vacant seat next to Mr. Moreno. SA Perry then grabbed a duffel from the overhead luggage racks, and asked if the bag belonged to Mr. Moreno. Not quite understanding at first what SA Perry asked of him, Mr. Moreno ultimately claimed ownership of the duffel and consented to its search.[3] SA Perry opened the duffel and quickly located a small black bag inside, which contained approximately one kilogram of heroin. SA Perry then arrested Mr. Moreno.

At preliminary hearing in this matter, counsel asked SA Perry if his encounter with Mr.

---

passengers reboarding the bus, Officer Perry displays a significant amount of movement in the rear of the bus, proximate to Defendant's seat and bags. Such movement can not be shown by a still photograph.

[3] Mr. Moreno is a mono-lingual Spanish speaker from Mexico; SA Perry has testified that he (Perry) knows enough Spanish "to get by" in his face-to-face encounters with Spanish speakers. SA Perry admits that Spanish is not his first language.

6

Moreno was audio recorded, as it is generally known that SA Perry routinely employs a digital recorder during his interdiction efforts.  SA Perry testified that his recorder was not functioning during his encounter with Mr. Moreno, so no recording exists of what was stated during the encounter.

ARGUMENT

Mr. Moreno's arrest on September 8, 2013 resulted from a calculated, unconstitutional, and seemingly routine practice by law enforcement officers at the Greyhound bus station.  It has been noted that the interdiction practiced by SA Perry and others amounts to a suspicionless[4] sweep of a bus in interstate travel:

> When the bus arrived at the terminal, the detectives did not have probable cause to believe that illegal drugs were on the bus.  Nor did they have articulable suspicion to suspect the presence of illegal drugs.  The detectives knew only that the west coast is the source of illegal drugs.  The detectives did not have the passengers' permission to examine their luggage.  Bus officials did not notify the passengers that their luggage was subject to inspection.  What occurred here, plain and simple, was a suspicionless sweep of a bus ion interstate travel.

---

[4] This is assuming that SA Perry had not received a tip that illegal contraband may be on board the Greyhound bus on September 8, 2013.  No information to this effect has been produced in discovery, but it is curious that the surveillance videos show a marked interest by both Walsh and Perry in medium-sized, black duffel bags or black roller bags.

The existence of "parallel construction", in which the National Security Agency (NSA) sends tips (learned in its international anti-terrorism wiretap investigations) to the DEA to make criminal, non-terrorism cases against citizens, has been documented and is an admitted practice by NSA and DEA.  It has been confirmed that NSA instructs the "Special Operations Unit" of the DEA to "recreate" the investigative trail and, specifically, to cover-up any involvement by SOD.  DEA agents then act as if the criminal case began with their own investigative efforts, instead of through NSA intelligence.  See, e.g. http://www.reuters.com/article/2013/08/05/us-dea-sod-idUSBRE97409R20130805 (Last visited November 22, 2013).

Contemporaneous to filing the instant motion, Defendant has filed a motion for discovery, specifically for the production of material that the DEA in Albuquerque received a tip or other alert from another law enforcement agency that illegal contraband might be on board the Greyhound bus on September 7-8, 2013.

*United States v. Nicholson*, 144 F.3d 632 (10th Cir. 1998).   On September 8, 2013, SA Perry and Officer Walsh engaged in a practice of pre-searching passengers' luggage, in the absence of probable cause, consent, a warrant, or any other exception to the Fourth Amendment.   The video evidence shows Perry and Walsh physically handling and manipulating luggage alongside the bus, and then inexplicably removing luggage to a remote location that is off-camera.   Furthermore, there is no doubt that SA Perry and Walsh enter the passenger compartment of the bus, where they remain uninhibited and alone, for over ten minutes.   Not surprisingly, SA Perry was standing toward the rear of the bus directly next to Mr. Moreno's luggage when passengers reboarded.   When Perry and Walsh couldn't find contraband in the luggage below, they moved their search to the bags left up top, by means that this Court should not countenance, and which the United States Supreme Court has found illegal.   See U.S. Const., Amend. IV;   *Bond v. United States*, 529 U.S. 334 (2000) (officer's physical manipulation of a bus passenger's carry-on luggage violated the Fourth Amendment's proscription against unreasonable searches); also see *United States v. Chadwick*, 433 U.S. 1 (1977) (framers intended the Warrant Clause to operate outside the home and apply equally to "persons, houses, papers, and effects").

    A.    **Perry and Walsh Pre-searched Luggage Contained in the Lower Luggage Bins As Well As Luggage Left on Board in the Passenger Compartment**

The evidence in this case will show that SA Perry and Officer Walsh operate outside of the bounds of the law, by not only physically manipulating luggage contrary to Bond, but almost certainly searching select bags without permission or knowledge of the owners.   SA Perry and Officer Walsh had no reason to remove luggage from the cargo bins, let alone remove said luggage to a remote location.   There is no evidence of a narcotics canine in this case, but one

8

can reasonably conclude that Perry and Walsh were aware of the surveillance cameras in the wash bay.  Moreover, Perry and Walsh also knew that there were no surveillance video on-board in the passenger area.[5]  The only reason that SA Perry and Officer Walsh had for removing bags from luggage bins and carrying them off site is to hide what they were doing; and the only reason to hide one's conduct is because that conduct is illegal.  One can only conclude that SA Perry and Officer Walsh pre-searched these bags.

Personal luggage is an "effect" protected by the Fourth Amendment.  *Bond v. United States,* 529 U.S. 334, 336-37 (2000).  In *Bond*, the Supreme Court held that an agent's physical manipulation of a bus passenger's bag stored in the overhead luggage bin of a bus violated the Fourth Amendment where the agent "conduct[ed] a probing tactile examination of petitioner's carry-on."  *Id*. at 337-39.  The Court asked two questions in reaching this holding: First, did the individual "through his conduct" exhibit a privacy expectation in the bag?  And second, was the individual's expectation of privacy one "that society is prepare to recognize as reasonable.?"  *Id*. at 338.  The Court answered both of these questions affirmatively.  The petitioner's bag was opaque, thus he wanted the contents to remain concealed, and although a bag placed in an overhead bin will likely be moved and handled, "he does not expect that other passengers or bus

---

[5] SA Perry and Officer Walsh must have known of the existence of the surveillance cameras at the Greyhound Bus Station, as their questionable conduct is the focus of another motion to suppress pending in the United States District Court for the District of New Mexico. In *United States v. Grobstein*, 13-CR-663 MV, Mr. Grobstein filed a motion to suppress on May 6, 2013, or four months prior to the events giving rise to the instant case.  Doc. 44.  The Government acknowledged the existence of the security camera system in its response.  Doc. 54.  The *Grobstein* motion was litigated before Judge Vazquez on September 9-10, the day after Mr. Moreno's arrest.  There can be no doubt that SA Perry and Officer Walsh knew of the surveillance cameras and knew what they were doing when they took bags off-camera.

employees will, as a matter of course, feel the bag in an exploratory manner." *Id*. at 338-39.

Courts have applied the same analysis to luggage placed in the bus' underneath cargo area. See, e.g., *United States v. Winborn*, 220 WL 1484489, at *6 (D. Neb. 2002) (unreported) (comparing the privacy expectation articulated in *Bond* associated with bags placed in overhead bin of bus to bags stored under the bus and finding that "the defendants has a subjective expectation of privacy when his bag is placed in a "bay" underneath a bus.  In both situations, the person who placed his or her bag on the bus has an expectation that the luggage will not be subjected to physical manipulation by other.  This court concluded that the defendant's subjective expectation is one that society is prepared to recognize as reasonable.").

In *Nicholson*, four detectives in Oklahoma City awaited a Greyhound bus traveling from San Diego, California to New York City.  After the passengers departed the bus for a layover, two detectives boarded the bus, pulled the bags out of luggage bins and manipulated them.  144 F.3d at 165.  At the same time, the other two detectives pulled the defendant's bag out of the underneath cargo area, "felt the sides of the bag with his palms perpendicular to the ground and flat, and detected 'several large bundles' inside it."  *Id*. at 634.  These actions appear similar to what SA Perry and Officer Walsh did when they searched luggage from the cargo caught on Greyhound's surveillance cameras.  The *Nicholson* court held that the manipulation of both the carry-on luggage and the luggage stored underneath the bus resulted in unconstitutional search. *Id*. at 639-40.

Further evidence of SA Perry and Officer Walsh's on– and off-camera mischief is SA Perry's telling communication with the Greyhound employee upon returning from his off-camera foray.  SA Perry gestured to the employee in a way that can only be construed as "nothing was

10

found".   And moments later, SA Perry more strongly communicated to the employee in a manner that can only be viewed as "don't say a word", when he pointed right at the employee, causing the employee to raise his hands in the air in a gesture of submission and compliance. The employee must have said something to the effect of "I didn't see anything".

The surveillance video also shows SA Perry and Officer Walsh board the passenger compartment, where they remained, off camera and alone, for over 10 minutes.   One must assume that SA Perry and Officer Walsh continued their questionable drug interdiction efforts in the passenger compartment, examining bags and luggage left there by the passengers.   The fact that SA Perry was waiting right beside Mr. Moreno's bag when passengers began the reboarding process suggests that SA Perry had pre-searched this bag.

**B.     The Eventual Search of Mr. Moreno's Bag Was the Product of Coercion**

When reviewing a bus encounter for Fourth Amendment purposes, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter."   *Florida v. Bostick*, 501 U.S. 429, 435-437 (1991).   The encounter is unconstitutional if, when "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."   *Id.* at 437.   Due to the fact that SA Perry had already concluded Mr. Moreno's bag contained contraband, likely through the illegal exploratory squeezes (or outright searches) described above, SA Perry was determined to search Mr. Moreno's bag.   Evidence of SA Perry's intent is admissible to prove he acted in conformity with that intent.   See Fed. R. Evid. 404(b).   Perry's "sneak and peak" earlier illegal search makes it more likely he acted in the way that left   Mr. Moreno no choice but to concede.

11

The voluntary nature of consent is a question of fact, and the court considers the totality of the circumstances in making this determination. *United States v. Dozal*, 173 F.3d 787, 795 (10th Cir. 1999). Relevant factors to consider in a totality of the circumstances analysis include "the threatening presence of several officers," the use of "aggressive language or tone of voice by an officer indicating compliance is compulsory," and interaction in a small space. *United States v. Rogers*, 556 F.3d 1130, 1137-38 (10th Cir. 2009); *see also Florida v. Royer*, 460 U.S. 491, 496 (1983) (noting that the defendant "found himself in a small enclosed area being confronted by two police officers—a situation which presents an almost classic definition of imprisonment," and the defendant's "consent to search, given only after he had been unlawfully confined, was ineffective to justify the search.") (internal quotation marks and citation omitted). Although not dispositive, whether the defendant received notification of the right to refuse consent is another "relevant fact to consider." *United States v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000). No such notification was given to Mr. Moreno. The government bears the burden of proof and "must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993).

        i.    **SA Perry Subjected Mr. Moreno to Intimidation and Coercion the Second Mr. Moreno Re-Boarded the Bus.**

When Mr. Moreno reboarded the bus and began walking to his seat, he saw Detective Walsh, in plain clothes, but clearly a law enforcement officer, standing at the front of the bus and speaking to another passenger. As he looked back toward his seat, he could see SA Perry standing in the middle of the aisle, right next to his seat, apparently waiting for the seat's occupant. Mr. Moreno is 31 years old, 5'10" in height, and approximately 190 lbs. in weight.

12

SA Perry, from counsel's observations during courtroom appearances, appears to be at least 5'10" in height and 200 lbs. in weight.  He has been a DEA Agent for 15 years.

When Mr. Moreno arrived at his seat, and before he could sit down, SA Perry immediately identified himself as an officer, showed him a badge on his side next to a pair of handcuffs, and began asking him questions.  From the minute Mr. Moreno boarded the bus, saw Walsh's drug interdiction taking place in the front of the bus, and saw an officer waiting next to his seat, it was clear that Detective Walsh and SA Perry had identified targets for investigation before the re-boarding had begun.  The pressure and ultimate outcome of the encounter was palpable before Mr. Moreno ever exchanged words with SA Perry.

This situation, where officers have already pre-determined their suspects—a tactic made perfectly clear to the passengers on the bus due to the officers' keen focus on two distinct passengers and disinterest in everyone else—is a far cry from a situation where officers board a bus and make casual contact with multiple passengers methodically throughout the bus.  *See, e.g.*, *United States v. Dreyton*, 536 U.S. 194, 198, 204 (2002) (during a bus interdiction, the officer "spoke to the passengers one by one and in a polite, quiet voice," working his way from the back of the bus toward the front, "speaking with individual passengers as he went.  He asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks."); *see also United States v. Tapia,* 309 F.3d 1283 (10th Cir. 2002) (during a bus interdiction, task force officers boarded a bus after passengers boarded, and told the passengers they were going to talk to "each and every one of [them].  It is not our intent in any way to delay your trip. I want you to feel free to move about . . . the bus as usual.").  *Id.* at 1285 (alteration in original).

13

Additionally, the coercive nature of Officer Walsh standing in the front of the bus investigating potential criminal activity while SA Perry stood next to Mr. Moreno's seat waiting to do the same is a far cry from the simple presence of multiple officers positioned throughout a bus. *See, e.g.*, *Tapia*, 309 F.3d at 1286 (holding that the presence of multiple officers is not, standing alone, coercive behavior). Mr. Moreno was not simply on a bus with a couple of officers; he was pinned between a criminal investigation in progress, and an investigation into his own alleged criminal activity.

### ii. SA Perry's Behavior Demanded Permission to Search Mr. Moreno's Bag.

SA Perry clearly expressed an intent to search Mr. Moreno's person and baggage, and no reasonable person in the same situation would have felt that he could cease the encounter. In *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000), a defendant challenged his "consent" to a vehicle search after an officer "asked if [he] could look in the vehicle and he paused for a while and then he finally said yes." *Id.* at n. 4. In holding this consent to be valid, the court noted that:

> there were no threats made, no cajoling, or demand of defendant to obtain consent. No pressure was applied by [the officer] against the defendant. The district court found nothing ambiguous or equivocal in [the defendant's] affirmative response to [the officer's] request for permission to search the car. We find nothing in the record to indicate that the district court erred in finding that [the defendant] voluntarily consented to the search of his car.

*Id.* at 1177.

REQUEST FOR AN EVIDENTIARY HEARING

Mr. Moreno requests an evidentiary hearing to develop the facts supporting his claim. In connection with the requested evidentiary hearing, defense counsel hereby requests, pursuant to

14

Fed. R. Crim. P. 12(h) and 26, that the government supply the prior statements (including Grand Jury testimony) of all suppression hearing witnesses including SA Perry and Officer Walsh at least 48 hours prior to the evidentiary hearing in this matter in order to avoid recesses during the course of the suppression hearing as anticipated by Fed. R. Crim. P. 26.2(d).

CONCLUSION

For the reasons stated above, Defendant Lehabim Ulises Moreno-Rubio requests that this Court suppress all items unlawfully seized from within Mr. Moreno-Rubio's luggage, as well as any statements that he may have made pursuant to the post-arrest interview process.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

___*filed electronically*___
JOHN F. ROBBENHAAR, AFPD
Attorney for Mr. Moreno-Rubio

I HEREBY CERTIFY THAT on March 5, 2014, I filed the foregoing electronically through the CM/ECF system, which caused AUSA Dave Walsh to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

___*filed electronically*___
JOHN F. ROBBENHAAR