UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 13-MJ-2857 |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| LEHABIM ULISES MORENO-RUBIO, | ) | Thursday, September 12,2013 |
| | ) | |
| Defendant. | ) | (9:59 a.m. to 10:22 a.m.) |


DETENTION / PRELIMINARY HEARING

BEFORE THE HONORABLE ROBERT H. SCOTT,
UNITED STATES MAGISTRATE JUDGE


Appearances:            See Next Page

Court Reporter:         Recorded; Liberty (ABQ-Hondo)

Clerk:                  C. Lopez

Interpreter:            B. Korp-Edwards

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES FOR:


Plaintiff:                    REEVE SWAINSTON, ESQ.
                              U.S. Attorney's Office
                              District of New Mexico
                              P.O. Box 607
                              Albuquerque, NM 87103

Defendant:                    JOHN ROBBENHAAR, ESQ.
                              Office of the Federal Public Defender
                              First State Bank Building
                              111 Lomas Boulevard NW
                              Suite 501
                              Albuquerque, NM 87102

U.S. Probation/Pretrial: Robert Sanchez

## INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jerald Perry | 5 | 13 | -- | -- |

**Albuquerque, NM; Thursday, September 12, 2013; 9:59 a.m.**

1          **(Interpreter Utilized for Translation)**

2                    **(Call to Order)**

3          **THE CLERK:**  *United States of America versus Lehabim*

4  *Ulises Moreno-Rubio.*

5          **MR. SWAINSTON:**  Reeve Swainston for the United

6  States.

7          **MR. ROBBENHAAR:**  Good morning, your Honor.  John

8  Robbenhaar on behalf of Mr. Moreno-Rubio, who is present.

9          **THE COURT:**  Good morning, counsel.  We'll let you get

10  him situated next to you --

11          **MR. ROBBENHAAR:**  Thank you, sir.

12          **THE COURT:**  -- at defense table.  We are scheduled

13  this morning for a preliminary and detention hearing.  Is the

14  Government ready to proceed?

15          **MR. SWAINSTON:**  It is, your Honor.  Thank you for the

16  Court's indulgence.  Two days ago I was able to secure the

17  presence of the case agent, Jerald (phonetic) Perry, and he is

18  here today.

19          **THE COURT:**  You may call your first witness.

20          **MR. SWAINSTON:**  Mr. Perry.

21           **JERALD PERRY, GOVERNMENT'S WITNESS, SWORN**

22          **THE CLERK:**  Thank you.  Have a seat.  State and spell

23  your last name for the record.

24          **THE WITNESS:**  First name is Jerald, last name Perry,

1    P-e-r-r-y.

2              **THE COURT:**  Counsel, your witness.

3              **MR. SWAINSTON:**  Thank you, your Honor.

4                         **DIRECT EXAMINATION**

5    **BY MR. SWAINSTON:**

6    Q    Mr. Perry, could you tell his Honor please briefly a

7    little bit about yourself, where you're employed and a bit of

8    brief background?

9    A    I'm a special agent with the Drug Enforcement

10   Administration here in Albuquerque, New Mexico.  I've been with

11   DEA in two more days will be 15 years.  I presently and have

12   for the past 13 1/2 years worked in what we term as an

13   interdiction unit.  We attempt to interdict or intercept drug

14   and/or money couriers that are either transporting illegal

15   narcotics or proceeds from illegal narcotics throughout the

16   country.

17   Q    How long have you been involved in interdiction work?

18   A    Approximately 13 1/2 years.

19   Q    All right.  And did your duties take you to the Greyhound

20   Bus Station here in Albuquerque on September 8th, 2013?

21   A    Yes, sir, they did.

22   Q    And on that date did you come into contact with anyone you

23   see here in court today?

24   A    Yes, sir, I did.

25   Q    And who is that?

1  A    That's the Defendant in this case, Mr. Moreno-Rubio.  He's

2  seated at defense counsel table.  He has an orange jumpsuit on,

3  has dark colored hair and has the earphones around his -- on

4  his ears.

5       **MR. SWAINSTON:**  Indicating the Defendant for the

6  record, your Honor.

7       **THE COURT:**  The record shall so reflect.

8       **(Witness identified Defendant)**

9  **BY MR. SWAINSTON:**

10 Q    Mr. Perry, would you tell his Honor briefly how it is that

11 you came into contact with the Defendant on that date?

12 A    Yes, sir.  Myself and another Task Force Officer, Jonathan

13 Walsh Barrett (phonetic), at the Greyhound Bus Station, we

14 boarded an eastbound bus that makes a regularly scheduled stop

15 here in Albuquerque.  I boarded the bus.  I subsequently made

16 contact with the Defendant in this case, displayed my DEA badge

17 to him, identified myself as a police officer, asked for and

18 received permission to speak with him.

19 Q    Very well.  And when you entered the bus can you tell us

20 approximately what time that was?

21 A    The bus was scheduled to arrive at approximately 3:00 a.m.

22 It was late.  It arrived at approximately 5:10 a.m.  It was

23 here for approximately an hour, so it was after 6:00 a.m.,

24 probably around 6:15, maybe 6:30 a.m. in the morning.

25 Q    When you approached the Defendant did you notice whether

1  or not he was alone or with anybody else?

2  A    He was seated in the aisle seat, so I didn't know at the

3  time if he was by himself or with anyone else.  But he was

4  seated by himself.

5  Q    At any time did you determine whether or not he was

6  traveling alone or with others?

7  A    From my belief I believe he was traveling by himself.

8  Q    Okay.  And did you have occasion to speak with the

9  Defendant once you came into contact with him?

10  A    Yes, sir, I did.

11  Q    Describe that encounter for the Court.

12  A    I displayed my badge to him, I identified myself as a

13  police officer, asked for permission to speak with him, which

14  he granted.  Then I asked him various questions about his

15  travel.

16  Q    And describe for us how that conversation played out.

17  A    I asked him where he was traveling to.  Initially he

18  couldn't -- he didn't answer the question.  He just handed me

19  his bus ticket after a pause.  I opened up the bus ticket.  It

20  revealed Fort Wayne, Indiana.  At that time when he saw the bus

21  ticket, he looked at it as I did, and he said Fort Wayne.

22       I reviewed it, returned the ticket to him.  I asked

23  him where he was traveling from.  He stated Phoenix.  I asked

24  him if he lived in Phoenix or Fort Wayne.  He stated he lived

25  in Sinaloa, Mexico.  I asked him if he had identification with

1    him.  He handed me a visa border crossing card under his

2    correct name.  I reviewed that and returned it to him.

3              I subsequently asked him if he had any luggage with

4    him.  He identified a tan colored backpack that was lying in

5    the empty window seat that was directly beside him.  I

6    subsequently asked for permission to search that backpack.  He

7    did give me permission; he handed it to me.  I conducted a

8    consensual search of the backpack.  It revealed water, food

9    items, but no form of clothing.  At that time I returned the

10   backpack to him.  I asked him if he had any other luggage with

11   him above the bus or below the bus, and he stated no.

12   Q    All right.  Did you at any time after the Defendant said

13   that he had no other luggage notice any other luggage in his

14   vicinity?

15   A    Yes, sir, I did.

16   Q    Tell us about that.

17   A    Directly one seat behind him in the overhead luggage

18   compartment was a Nike branch black colored -- I'll refer to it

19   as a duffle bag or a sports bag.  I removed that bag and

20   attempted to determine the ownership of it.  No one in the rear

21   of the bus determined ownership of it.  Then I approached the

22   Defendant in this case.  He stated that the black duffle bag

23   did belong to him.

24   Q    And that was after previously stating that he had no other

25   luggage.

1   A     That's correct.

2   Q     Did he specifically deny that that bag was his initially?

3   A     No.  He just stated he didn't have any other luggage.  And

4   then when I showed it to him and held it in my hand, he did

5   state that it belonged to him.

6   Q     Okay.  All right.  Just so we're clear, you described a

7   duffle bag.  Can you give us an idea of the dimensions?  I'm

8   thinking of a big military duffle bag maybe three feet high.

9   What did you see?

10  A     No, sir.  It's a little -- I say compared to the duffle

11  bag that you're explaining it's a lot smaller.  It's basically

12  a gym bag that has a zipper on each end, a zipper that goes

13  around the middle, two handles that has a Velcro attachment at

14  the top that you carry in your hand.  It's basically maybe two

15  feet long by 18 inches wide, maybe 12 inches wide.

16  Q     Is it the kind of bag you can just throw over your back?

17  A     Yes, sir.  Like people take to the gym to work out for

18  their workout clothes.

19  Q     All right, very well.  After the Defendant identified this

20  second bag as his bag and after you determined that no one else

21  claimed ownership of it what, if anything, did you do next?

22  A     I asked the Defendant if he would voluntarily consent for

23  me to search it for contraband.  He did give me permission to

24  search it.  I set it down in the empty aisle seat directly

25  across from him and I unzipped it.  It contained various

 1  clothing items, men's clothing items, and also it contained a

 2  black colored electronic bag.  Basically it's a case or a -- I

 3  don't know if it's a case or a holder for kind of like a

 4  laptop, a small laptop.  It has a zipper on the top.

 5           As soon as I picked it up I felt a large bundle

 6  inside.  I unzipped it.  When I unzipped it there was a large

 7  bundle that was wrapped in clear saran wrap with various layers

 8  of red colored type grease or transmission fluid.  And I

 9  immediately knew from my training and experience that the

10  bundle and its concealment method was consistent with illegal

11  narcotics.

12  Q    You had seen that many times before?

13  A    Yes, sir, I have.

14  Q    Was there anything with respect to this second bag that

15  provided any indication of who might own the bag?

16  A    Yes, sir.  On the top of the bag that had the Velcro where

17  it wraps around the two handles where you can hold them

18  together, when you undid the Velcro it has a place for your

19  name.  And it had a full name of the Defendant in this case,

20  his first, middle and two -- his hyphenated two last names

21  written in ink on the top of the bag.

22  Q    Very well.

23           **MR. SWAINSTON:**  The Court's indulgence for a moment.

24           **THE COURT:**  Yes, sir.

25           **(Pause)**

1   **BY MR. SWAINSTON:**

2   Q    After you found that bag, which based on your training and

3   experience you believed contained contraband what, if anything,

4   did you do at that point?

5   A    At that time the Defendant was handcuffed and placed under

6   arrest.

7   Q    What, if anything, did you do with respect to the item you

8   identified as potential contraband?

9   A    We transported it back to the office.  It was weighed.  It

10  weighed approximately 1.05 gross kilograms, that is with the

11  packaging.  We cut into it.  When I say "we," myself and Task

12  Force Officer Walsh.  It revealed a brownish colored powdery

13  substance that did field test positive for the presence of

14  heroin.

15  Q    And without the packaging is it your estimation that it

16  weighed more than 1 kilogram of heroin?

17  A    I would estimate it's going to be very close.  But in

18  concurrence with the United States Attorney's Office they

19  suggested that we charge an A level, which it was in this case.

20  Q    At this point we don't know and after we get a net weight

21  we'll figure that out.

22  A    Yes, sir, that's correct.

23  Q    But in your opinion is it your position that it could

24  weigh more than 1 kilogram?

25  A    Yes, sir.

1   Q    Okay.  And it field tested positive for the presence of

2   heroin?

3   A    Yes, sir, it did.

4   Q    Very, very briefly, my understanding is that the Defendant

5   did provide a post-arrest statement, and in that post-arrest

6   statement he told you he didn't know anything about the heroin.

7   Is that a correct assessment of what he said?

8   A    Yes, sir, that is correct.

9   Q    Okay.  But he did claim ownership of the bag that was in

10  the -- where the heroin was contained.

11  A    Yes.  He said the bag was his, he brought it from Mexico,

12  and all the contents in the bag belonged to him except for the

13  black zipper electronic type holder with the bundle inside.

14  Q    Very well.  Before we wrap this up on the issue of

15  probable cause, can you tell his Honor what, if anything, you

16  noticed about the Defendant's demeanor that morning?

17  A    He wasn't overly nervous or anything like that.  Basically

18  I know -- I did notice that when he -- when I showed him the

19  bag and while I was searching it, which he wasn't before he

20  looked at me as I spoke with him when he handed me his ticket;

21  but when I started searching the bag, he immediately got his

22  phone out and he was -- I don't know if he was texting or he

23  was doing something with his phone.  He was staring straight at

24  the phone.  He wasn't watching me, which in my opinion I

25  thought was odd.

1    Q    Very well.

2         **MR. SWAINSTON:**  Your Honor, that's all I have on

3    probable cause at this time.

4         **THE COURT:**  Cross examination?

5         **MR. ROBBENHAAR:**  Thank you, Judge.

6                        **CROSS EXAMINATION**

7    **BY MR. ROBBENHAAR:**

8    Q    Agent Perry, what time would you say you arrived at the

9    Greyhound Bus Station on September 8th?

10   A    Actually, I arrived on September the 7th.

11   Q    Okay.

12   A    We were doing a weekend special search, and I arrived at

13   approximately 9:00 p.m. on September the 7th, I believe.

14   That's the night before my -- it was a long weekend, so my

15   hours and dates might not be exact.

16   Q    All right.  So it was some time in the evening of

17   September 7th?

18   A    Yes, sir.

19   Q    And there were other buses that you were greeting or

20   meeting that evening and that early morning?

21   A    Yes, sir, that's correct.

22   Q    All right.  So you didn't arrive at 9:00 p.m. just waiting

23   for the 3:00 a.m. arrival of this particular bus.

24   A    No, sir.  We were doing a special and I --

25   Q    All right.

 1   A     -- checked numerous other buses.

 2   Q     So this bus was scheduled to arrive in Albuquerque at

 3   approximately 3:00 a.m. I heard you say?

 4   A     That's the scheduled arrival time, yes, sir.

 5   Q     It was late and it arrived some time 5:15; is that right?

 6   5:10?

 7   A     I believe it was approximately 5:10 a.m.

 8   Q     All right.  And when a bus arrives at the Greyhound

 9   Station in Albuquerque all passengers are asked to de-board; is

10   that correct?

11   A     Yes, sir, that is correct.

12   Q     And so all passengers get off the bus, go into the --

13   presumably into the waiting station, correct?

14   A     You can do that or you can stay outside or wherever you

15   wish to go.

16   Q     All right.  And then the buses move to a different

17   location for cleaning and for fueling?

18   A     Yes, sir, that's also correct.

19   Q     And is that other location just a building directly south

20   of the terminal?

21        **MR. SWAINSTON:**  Your Honor, I'm going to object to

22   this line of questioning.  I let it go on a little bit, but

23   it's not relevant to the issue of probable cause.

24        **THE COURT:**  Overruled.  You can develop it, Counsel.

25        **MR. ROBBENHAAR:**  Thank you, Judge.

1       **THE WITNESS:**  Yes, it is south of the bus terminal.

2  **BY MR. ROBBENHAAR:**

3  Q    And I think I heard you state earlier, Agent Perry, that

4  the layover here in this particular case was something in the

5  neighborhood of an hour, maybe just a little bit longer; is

6  that right?

7  A    This bus, along with all buses, are here for approximately

8  an hour or an hour and five minutes unless there's some type of

9  delay or mechanical problem.

10 Q    All right.  During that hour, Agent Perry, did you board

11 the bus in this case?

12 A    I believe I did.  I can't recall.  We had worked all

13 night, so we boarded some of the buses.  We may have boarded

14 this bus.  I can't recall for sure, 100 percent sure.

15 Q    So you may have boarded the bus during the cleaning

16 process when all passengers were off.

17 A    Yes, sir.  I may have, yes.

18 Q    And would that be similar to Task Force Officer Walsh?

19 A    Yes.  We were working together.

20 Q    All right.  And during that hour boarding -- excuse me --

21 cleaning and fueling period did you also go into the -- under

22 the bus into the cargo bays?

23 A    If we did that, I'm not exactly sure on this specific bus.

24 As I stated earlier, we checked a lot of buses and I can't

25 remember if we did each and every bus.  But that would be a

1   normal procedure.  But I don't know if we did on this specific

2   bus or not.

3   Q    Agent Perry, I understand -- well, it's obvious, you did

4   not -- you're not the affiant in this case.

5   A    I didn't -- no, I'm not the affiant on the Complaint.

6   Q    Or I should say you didn't write out the Criminal

7   Complaint.

8   A    Actually, I did type out the Criminal Complaint, but my

9   name is not on it.

10  Q    Why is that?

11  A    Because we had worked all night and I knew that I had a

12  suppression hearing in Santa Fe on Monday and Tuesday.

13  Q    I see.

14  A    And I knew that I wouldn't be in court for the initial and

15  the preliminary hearing.  So I asked the affiant if she would

16  come to court and do all the things she needed to do for court

17  for me.

18  Q    And that's Special Agent Olmstead (phonetic); is that

19  right?

20  A    Yes, sir, that's correct.

21  Q    All right.  Now, but you typed in this Affidavit; is that

22  right?

23  A    Yes, I did type the Affidavit.

24  Q    Did you include all the information that you were aware

25  of, or is this just information pertinent only to probable

1  cause?

2  A    It's just for probable cause.  I believe the last

3  statement on the Criminal Complaint states it's just for

4  probable cause only.

5  Q    Okay.  Was there information that you did not include in

6  this Complaint that you obtained about Mr. Moreno-Rubio before

7  his arrival in Albuquerque?

8  A    I don't understand your question.

9  Q    Did you omit information in the Affidavit that you had

10 obtained about my client before the bus arrived in Albuquerque?

11 A    No, there's no information that's been omitted.

12 Q    Did you interview and search other individuals' bag on

13 this particular bus?

14 A    Yes, sir, I did.

15 Q    You searched their bags, too?

16 A    Yes, sir, I did.

17 Q    Okay.  And are you aware that Officer Walsh also

18 interviewed and/or searched other bags on this particular bus?

19 A    I wasn't watching Officer Walsh, but he was in the front

20 of the bus; I was in the rear.  And I know he spoke with

21 numerous other passengers.  And after the Defendant was

22 arrested, I did observe him search other passengers before

23 that.

24 Q    Okay.

25 A    I would assume he was doing that.  That's what he normally

1    does.

2    Q    Now, it's true when the passengers re-boarded the bus

3    after the cleaning process you were already on the bus,

4    correct?

5    A    That is correct.

6    Q    Toward the back of the bus.

7    A    I work at the rear and Officer Walsh -- that's our normal

8    practice -- works at the front of the bus.

9    Q    When you approached Mr. Moreno-Rubio he was seated by

10   himself and on the passenger -- or on the seat right next to

11   him was a tan backpack; is that right?

12   A    Yes, sir, that is correct.

13   Q    And you asked -- after preliminarily talking to him about

14   travel plans, you asked for consent to search his bag and he

15   gave you that consent, right?

16   A    Yes, sir, he did.

17   Q    And you searched the bag.  You mentioned earlier in your

18   testimony that there was no clothing other than food stuffs and

19   that kind of stuff, but no clothing; is that right?

20   A    Yes, sir.  I don't recall any other clothing.

21   Q    Ultimately you located a bag on the overhead rack; is that

22   right?

23   A    I'm sorry, can you repeat your question?

24   Q    After searching the tan backpack you located the duffle

25   bag you referred to earlier and that was on the overhead rack;

1   is that right?

2   A    No, sir, that's not correct.

3   Q    Where was the duffle bag?

4   A    It was there, but you asked me if I located it after I saw

5   the tan backpack.  Actually, I had seen it earlier when I was

6   speaking with the passenger that was to the rear of the

7   Defendant.  When I was speaking with them I asked about luggage

8   and searched luggage, and then I saw it directly above the seat

9   and the two passengers that were seated directly behind him.

10  Q    Ultimately you bring the duffle bag and show it to

11  Mr. Moreno-Rubio, right?

12  A    Yes.  After showing it to other passengers, also.

13  Q    All right.  And at that time when you showed it to him, he

14  admitted that's his bag.

15  A    Yes, sir, he did.

16  Q    Now, your conversation with Mr. Moreno-Rubio was in

17  Spanish; is that right?

18  A    Yes, sir, it was.

19  Q    And Agent Perry, clearly Spanish is not your first

20  language; is that right?

21  A    That's correct.

22  Q    Is West Virginian your first language?

23  A    I don't believe West Virginia is actually a language.

24       **MR. ROBBENHAAR:**  Strike that, Judge.  I'm sorry,

25  Judge.

1  Q    But Spanish you've learned over the past 13 years, you've

2  picked up Spanish through your work; is that right?

3  A    Yes.  I'm not fluent in Spanish but I can conduct a

4  consensual encounter in Spanish.

5  Q    You mentioned in your testimony earlier, Agent, that when

6  you asked Mr. Moreno-Rubio if there were other luggage he

7  said -- if he had other luggage he said no.  Is that your

8  testimony?

9  A    Yes, sir.

10 Q    Is there a chance, Agent Perry, that he didn't understand

11 your question?

12 A    Well, there's always a chance that someone couldn't

13 understand the question that I asked them, but he immediately

14 said "no."

15 Q    Well, but then when you showed -- when you showed him this

16 bag, he immediately said, "Yeah, that's my bag"; is that right?

17 A    He did state that the bag was his once I showed it to him,

18 yes.

19 Q    Now, inside this duffle bag you mentioned there's another

20 bag; is that right?  There's an electronic bag, this black

21 zippered like a computer bag; is that right?

22 A    It was a computer bag.  It kind of had that -- I don't

23 know what it's made from, but it's kind of very thin like for a

24 laptop.

25 Q    Okay.  And Mr. Swainston asked you after all was said and

1   done and Mr. Moreno-Rubio had been arrested you asked -- you

2   were asked about a post-arrest statement and in that post-

3   arrest statement my client disavowed any knowledge or ownership

4   of that particular black bag; is that right?

5   A    That's a correct statement, yes, sir.

6   Q    All right.  Was your interaction with Mr. Moreno-Rubio

7   recorded?

8   A    I attempted to record it.  My battery died on my recorder,

9   so the actual part where I spoke with Mr. Rubio was actually

10  not recorded.

11  Q    Do you know if Agent Walsh was recording his interactions

12  with passengers that evening?

13  A    I assume that he was.  He normally records just like both

14  of us do.

15          **MR. ROBBENHAAR:**  If I may have a moment, your Honor.

16          **THE COURT:**  Yes, sir.

17      **(Pause)**

18          **MR. ROBBENHAAR:**  Those are all the questions I have

19  this morning, Judge.

20          **THE COURT:**  Is there any redirect?

21          **MR. SWAINSTON:**  No, your Honor, not on probable

22  cause.

23          **THE COURT:**  May this witness be excused?

24          **MR. SWAINSTON:**  Yes, sir.

25          **THE COURT:**  You may step down.  You are excused from

1  the proceedings.

2          **THE WITNESS:**  Thank you.

3      **(Witness steps down)**

4          **THE COURT:**  Does the Government have any further

5  evidence or testimony?

6          **MR. SWAINSTON:**  Not on probable cause, your Honor.

7          **THE COURT:**  Does Defense care to put forward any

8  evidence or testimony on that issue?

9          **MR. ROBBENHAAR:**  No, your Honor.  No argument on

10  probable cause.

11          **THE COURT:**  Thank you.  Does the Government wish to

12  make any argument?

13          **MR. SWAINSTON:**  No, your Honor, I do not.  I think

14  the testimony speaks for itself and meets the elements of the

15  offense, and we ask that the Court bind the Defendant over for

16  trial.

17          **THE COURT:**  The Court has considered the testimony,

18  the Affidavit in support of the Complaint, and makes a finding

19  of probable cause to believe that an offense has been committed

20  and that this Defendant committed it.

21          Counsel, do you wish to speak to his conditions of

22  release?

23          **MR. ROBBENHAAR:**  Your Honor, it appears from the

24  Pretrial Services Report that -- well, I think there's a

25  mention of an ICE detainer at this point.  My client is here in

1   the United States legally; he had a visa.  I don't think that

2   precludes him from seeking conditions of release.  He has zero

3   criminal history.  Obviously, this is a case that carries a

4   presumption of detention, I understand that.  But there's no

5   other reason to believe that he is a danger to the community,

6   and I think conditions can be fashioned.  Of course, I

7   understand the ICE detainer as it is might cause the Court to

8   fashion -- or rule otherwise, Judge.

9          **THE COURT:**  Does the Government wish to be heard?

10         **MR. SWAINSTON:**  Just that, your Honor, setting aside

11  the detainer issue, which in and of itself is problematic for

12  the Defendant, the Defendant is presumptively a flight risk and

13  came to this country, was found in possession of a large amount

14  of heroin, and he was traveling across our highways and has no

15  ties to this district or this specific community.  I think that

16  he's not only a presumptive flight risk, he is inherently a

17  flight risk and a presumptive danger to the community by virtue

18  of his criminal conduct.

19         **THE COURT:**  The Court respectfully agrees with the

20  Government.  I don't know the circumstances of the ICE

21  detainer.  All I know is that I'm told by Pretrial Services

22  that on September 9th, ICE placed a detainer on the Defendant

23  and that it remains outstanding.  So I'm going to remand him

24  back to the custody of the Marshal.

25         **MR. ROBBENHAAR:**  Very well.  Thank you, Judge.

1          THE COURT:  We'll be in recess.

2      (This proceeding was adjourned at 10:22 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          March 11, 2014_


                    TONI HUDSON, TRANSCRIBER