IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | CRIMINAL NO. 13-3140 JH |
| vs. | ) | |
| | ) | |
| **LEHABIM ULISES MORENO-RUBIO**, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. 28)

The United States hereby submits this response in opposition to Defendant's Motion to Suppress Evidence (the "Motion"). Defendant, in essence, alleges that: (1) his bag along with others were unlawfully "pre-searched" on the Greyhound bus; and (2) the search of Defendant's bag was a product of coercion.[1]

The United States disagrees. The evidence in this case establishes that Defendant's encounter with Special Agent ("SA") Jarrell Perry of the Drug Enforcement Administration ("DEA") was consensual, and that once SA Perry observed a packaged kilogram of heroin in Defendant's bag, he had probable cause to arrest the Defendant.

### DEFENDANT'S LACK OF STANDING

Defendant's Motion incorporates numerous still images derived from video footage from the Greyhound bus terminal. None of these images refer to the actual encounter with the Defendant, and Defendant does not have a reasonable expectation of privacy in some unknown

---

[1] Defendant specifically alleges that the search of his bag was the product of coercion, that he was subjected to intimidation and coercion, and that Special Agent Jarrell Perry's behavior demanded permission to search his bag. Defendant's Motion, pp, 11-15.

1

person's bag. Defendant thus devotes the bulk of his Motion making arguments and discussing conduct that is ultimately irrelevant to the issues at hand. Consequently, Defendant has no standing to criticize any conduct depicted in any of the still images in his motion or the videos that were obtained by the defense, since none of it pertains to his encounter or the search of his bag, all of which occurred while the Defendant was on board the bus.[2]

## SUMMARY OF THE FACTS

On September 8, 2013, SA Perry and DEA Task Force Officer (TFO) Jonathon Walsh were at the Greyhound Bus Station, 320 First Street, Albuquerque, New Mexico to meet the eastbound Greyhound Bus which makes a regularly scheduled stop in Albuquerque, New Mexico. Beforehand, SA Perry had reviewed a passenger manifest that breaks down the passengers by city of origin, something that is important to SA Perry, because he recently has had arrested a number of passengers for transporting narcotics on the bus whose origin was near Phoenix or Glendale, AZ.

When the Greyhound bus arrives in Albuquerque, passengers are instructed to exit the bus for the layover, while the bus is cleaned and refueled, all of which takes approximately one hour. Passengers are advised that they can either take their bags with them or leave them on the bus. The bus will then drive a short distance to a wash bay area for cleaning. While the bus is at the wash bay and empty of passengers, SA Perry and his law enforcement counterparts will, at times, visually inspect bags that are in the cargo space at the bottom of the bus and subject them

---

[2] In his motion, Defendant cites to the case of *United States v. Grobstein*, Criminal No. 13-663 MV. Of note in that case was the court's ruling on Defendant's motion for Rule 17(c) subpoenas, Document 40, wherein the court granted the defense's request for a subpoena only for all on-board audio and/or video recordings. The court reasoned that the defense failed to show how the audio and video recordings were relevant with respect to his request for recordings of Greyhound cleaning bays, offices, and parking and loading areas, which encompasses the same footage that is presented in Defendant's motion in the case at hand.

to dog sniffs from trained canines.³ Here, after the bus left the wash bay area and proceeded to the passenger loading area, SA Perry and TFO Walsh boarded the bus and began conducting consensual encounters as the passengers began re-boarding.⁴ SA Perry spoke with approximately four to five passengers before encountering the Defendant, where he stood to the rear of the Defendant's seat so as to not block his egress. SA Perry then asked the Defendant for permission to speak with him in English to which the Defendant did not respond. SA Perry then asked the Defendant if he spoke English to which the Defendant said a little bit. In the Spanish language, SA Perry asked the Defendant if he spoke Spanish, and the Defendant responded in the affirmative.

Next, SA Perry identified himself as a police officer and showed him his badge and asked him in Spanish if he could speak to him. Defendant said yes. SA Perry then asked where he was traveling to, and the Defendant did not respond, but looked straight forward and handed SA Perry a greyhound bus ticket folder with various tickets contained inside. While SA Perry was looking at the tickets, the Defendant leaned out into the aisle and said "Fort Wayne." SA Perry asked the Defendant where he was traveling from, and the Defendant replied "Phoenix." In response to SA Perry's question of where he was from, he stated "Sinaola, Mexico." SA Perry then asked him if he had any luggage with him. Defendant said yes and pointed to a tan backpack that was sitting in the empty window seat directly beside him. SA Perry asked him if he could search the backpack; the Defendant consented, picked up the tan backpack, and then

---

³ Defendant's Motion in no way reveals a Fourth Amendment violation with regard to another person's luggage. Law enforcement is allowed to physically touch and handle luggage and subject it to dog sniffs. They simply cannot physically manipulate a bag from the exterior. *See Bond v. United States*, 529 U.S. 334 (2000); *United States v. Nicholson*, 144 F.3d 632, 637 (10th Cir. 1998) ("The circuits uniformly agree that an officer's touching of a bag's exterior does not necessarily constitute a search."). *See also*, *Florida v. Jardines*, 133 S.Ct. 1409, 1419 n. 2 (2013) (a human sniff is not a search).

⁴ SA Perry's recorder did not function properly on the day in question, as the battery had died. SA Perry provided a disc of a twenty-one second inaudible recording derived from his recorder that day.

3

handed it to SA Perry. Pursuant to his search of the backpack, SA Perry observed paperwork, water bottles, and food items, but no clothing. SA Perry asked him if he had any other luggage on his seat or below the bus and gestured with his left hand to the overhead luggage compartment and also around his seat when he asked the Defendant if he had any other luggage with him. The Defendant responded that he did not. With the permission of the Defendant, SA Perry proceeded to search Defendant's shoes for contraband with negative results.

SA Perry had earlier observed a Nike brand duffel bag that was lying in the overhead luggage compartment one seat to the rear of where the Defendant had been sitting. None of the passengers had claimed ownership of the bag previously. SA Perry removed the duffel bag from the overhead luggage compartment and observed that it did not have a name tag attached. SA Perry then approached the Defendant and asked him twice whether it was the Defendant's bag, and the Defendant answered in the affirmative on both occasions. SA Perry next asked the Defendant if he had permission to search the bag to which the Defendant indicated "yes." SA Perry observed the name of "Lehabim Ulises Moreno Rubio" on a name tag that was sewn into the top portion of the Velcro part that held the two handles together.

SA Perry unzipped the black Nike bag, which revealed various items of male clothing and a black-colored zipper type electronic bag lying on top of the clothing. SA Perry picked up the black bag and immediately felt a large bundle side. After unzipping the electronic bag, SA Perry observed a clear saran wrapped, hard-like bundle which had various layers of red colored grease inside of the saran wrapping. SA Perry immediately knew from his training and experience that the bundle and its packaging were consistent with illegal narcotics. While searching the bag, SA Perry observed the Defendant holding his cellular phone in his hands and looking at the phone.

## **STATEMENT OF THE LAW**

    I. CONSENSUAL ENCOUNTERS

A consensual encounter is simply the voluntary cooperation between a citizen and a police officer. *Michigan v. Chesternut*, 486 U.S. 567, 574-576 (1988). Accordingly, consensual encounters are not seizures for the purposes of the Fourth Amendment and are assessed under the totality of the circumstances. In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991). That rule applies equally to encounters that take place on planes, trains, and city streets. *Id*.

Thus, an encounter is deemed consensual if the defendant is "free to leave at any time during the encounter." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). However, when a person is in a confined space the analysis turns on whether a person would feel free to decline an officer's request or otherwise feel free to terminate the encounter. *Bostick*, 501 U.S. at 434.

Courts have identified several factors that could lead to a reasonable innocent person to believe he is not free to disregard the police officer, including: the threatening presence of several officers, the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or small enclosed space; and absence of other members of the public. *See United States v.*

*Mendenhall*, 446 U.S. 544, 554 (1980); *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984); and *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993).

Particular personal traits or subjective state of mind of the defendant are irrelevant to the objective "reasonable person" test, other than to the extent they may have been known to the officer and influenced his conduct. *Zapata,* 997 F.2d at 757. In addition, a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication that the search was within the scope of consent. *See*, *e.g.*, *United States v. Pena,* 143 F.3d 1363, 1368 (10th Cir. 1998); *United States v. Sanchez,* 89 F. 3d 715, 719 (10th Cir. 1996).

The Fourth Amendment permits law enforcement to approach an individual in a public place, identify himself as a law enforcement officer, and ask questions. *Florida v. Royer*, 460 U.S. 491, 4976 (1983). The permissibility of this conduct does not depend on any level of suspicion of the person being approached; they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means. *United States v. Drayton*, 536 U.S. 194, 201 (2002).[5] Whether an encounter is consensual is determined by the totality of the circumstances. *United States v. Spence*, 397 F.3d 1280, 1283-1284 (10th Cir. 2005) (an explicit advisement that a person has a right to terminate the encounter or refuse consent is merely one factor and is not required).

II. CONSENT TO SEARCH

There is no controlling significance with respect to whether a person knows he has the right to refuse consent or not. *United States v. Watson*, 423 U.S. 411, 424 (1976). Moreover, the

---

[5] An officer's subjective intentions are irrelevant for the purposes of Fourth Amendment analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Santana-Garcia*, 264 F.3d 1188, 1192 (10th Cir. 2001) (an officer's subjective belief as to probable cause is not dispositive as to the lawfulness of the arrest).

law recognizes that there is an inherent pressure when someone is subjected to the scrutiny of law enforcement and assumes that a reasonable person can still exercise a free choice. *Id*. at 535.

The Tenth Circuit has articulated a two-step test for determining the validity of consent: "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) the government must prove consent was given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (internal quotation marks omitted). The question whether a consent to search is the product of duress or coercion is determined by the totality of the circumstances. *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). Relevant considerations

> include physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights[6], obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id*.

## ARGUMENT

I. DEFENDANT CONSENTED TO SPEAK TO SA PERRY AND TO THE SEARCH OF HIS PERSON AND HIS BAGS.

A defendant's consent need not be verbal, and defendant's failure to object when the search exceeds what he later claims was a more limited consent is an indication the search was within the scope of consent.[7] In this case, however, Defendant gave explicit consent to speak with SA Perry and to the searches of his person and his bags. SA Perry's exchange was in Spanish, and Defendant's responses to SA Perry's questions were indicative that he understood

---

[6] A person can give voluntary consent while being lawfully detained. *United State v. Flores*, 48 F.3d 467, 468-69 (10th Cir. 1995).

[7] *Guerrero*, 472 F.3d at 789 (10th Cir. 2007); *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

7

SA Perry's Spanish. For example, after SA Perry asked the Defendant where he was traveling to, the Defendant after not immediately responding handed SA Perry his ticket folder with various tickets inside. After SA Perry opened up the ticket folder, the Defendant leaned out into the aisle and looked at the bus ticket and then said, "Fort Wayne." In addition, in response to SA Perry's request for permission to search his person, the Defendant promptly stood up and stepped into the aisle way.

The Tenth Circuit has provided a list of factors to determine if an interaction was consensual. Drawing upon the Supreme Court case of *Drayton*, the Tenth Circuit has noted the following to be relevant:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor, and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identifications; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

The above-referenced factors applied to this case weigh in favor of voluntary consent in this case. Defendant was on a public bus, within view of persons other than law enforcement. *See id*. at 1227 ("[t]he presence of other citizens during a police encounter is one factor suggesting its consensual nature."). SA Perry did not physically restrain or touch Defendant until he placed him under arrest, having already observed the bundle of heroin in his Nike bag. SA Perry did not display his weapon to Defendant. *See id.* (lack of touching or display of force tends to suggest the encounter was consensual). SA Perry was wearing plain clothes, not a uniform. Defendant was only approached by one officer, SA Perry, and there was only one other officer on the bus at that time. SA Perry's behavior was respectful and in no way coercive, and SA Perry spoke to Defendant in a consistently polite tone of voice. SA Perry did not retain any

8

of Defendant's personal effects for more than the few seconds necessary to examine them, with Defendant's consent. Moreover, SA Perry did not obstruct Defendant's movements within the train. *See Drayton*, 536 U.S. at 204 (noting the fact that the officers had not blocked the defendant on the bus as a factor in favor of a consensual encounter).

The sole factor *possibly* not weighing in favor of consent is that SA Perry did not specifically advise Defendant that he had the right to terminate the encounter or refuse consent. The Tenth Circuit, however, has found that this factor, having been rejected as a requirement by the Supreme Court, "should carry little weight" in the analysis. *Thompson*, 546 F.3d at 1228. However, given the weight of the other factors, the encounter with Defendant was consensual and the search of the Nike bag was supported by a knowing and voluntary consent. Here, there simply is no basis to view the encounter as amounting to an investigatory detention.[8] Furthermore, once SA Perry asked the Defendant to search his Nike bag, and the Defendant said "yes," SA Perry had probable cause to arrest the Defendant upon seeing the clear saran-wrapped, hard-like bundle of heroin.

II. DEFENDANT'S CONSENT WAS VALID.

Defendant's consent was valid and was not the product of coercion. The aforementioned nature of the consensual encounter between SA Perry and the Defendant - the lack of force, polite tone, etc. – is also evidence of Defendant's valid consent. Moreover, SA Perry did not use any trickery or deceit or make any false promises in requesting and obtaining consent from the Defendant. His requests for permission to search were straight forward and clear cut.

---

[8] Since the encounter was consensual up and until the Defendant's arrest, the Court need not reach the question as to when reasonable suspicion may have developed. Nonetheless, the United States contends that reasonable suspicion arose from at least the time when Defendant first denied then admitted ownership of his Nike duffel bag.

This case, in fact, is similar to the Supreme Court case of *Drayton*, which reiterated the proposition that police officers do not have to always inform citizens of their right to refuse a request for a consent search. *Drayton*, 536 U.S. at 204 (citations omitted). Here, as in the case of *Drayton*, there was no application of force, no intimidating movement, no blocking of exits, no threat, no command, not even an authoritative tone of voice. *Id*. Additionally, the passengers in *Drayton* were re-boarding the bus after refueling when three plain clothes officers – as compared to two in the instant case – boarded the bus to interact with passengers while they carried concealed weapons and visible badges[9] as part of a routine drug and weapons interdiction effort. Ultimately, the Court held that there was no seizure under the Fourth Amendment and that the defendant's consent to the search of his person was voluntary.

In doing so, *Drayton* recognized that the Fourth Amendment "permits police officers to approach bus passengers at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse." *Drayton*, 536 U.S. at 197. The Court also stated that, "[i]n a society based on law, the concept of agreement and consent should be given a weight and dignity of its own." *Drayton*, 536 U.S. at 207. Further, the Court noted that "[p]olice officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences or coercion." *Id*.

The Tenth Circuit and other courts have followed suit, citing *Drayton* in upholding the lawfulness of police conduct in similar bus interdiction scenarios. *See United States v. Tapia*, 306 F.3d 1283 (10th Cir. 2002) (plainclothes officers did not violate the Fourth Amendment

---

[9] As in the case with SA Perry, one of the officers in *Drayton* displayed his badge, though the Court was unpersuaded that this fact and the fact that the officers were wearing sidearms established a Fourth Amendment seizure. *Drayton*, 536 U.S. at 204-205.

where drug detection dog sniffed luggage in lower baggage compartment prior to encounter with Greyhound bus passenger on board the bus); *United States v. Correa*, 641 F.3d 961, 966 (8th Cir. 2011) (in encounter with bus passenger officers followed the same procedure used in *Drayton*); *United States v. Williams*, 365 F.3d 399, 404 (5th Cir. 2004) (bus passenger was lawfully encountered in bus terminal and gave voluntary consent to search of bag).

In his Motion, Defendant attempts to distinguish *Drayton* and *Tapia* from the case at hand by alleging that SA Perry and Detective Walsh pre-searched bags and pre-determined suspects. None of the bags on the bus were ever pre-searched, and there is no video footage that establishes as such. Bags that were in the cargo space were handled in a manner that did not amount to an exploratory feel or physical manipulation – they were moved, checked for luggage tags, etc. *See Untied States v. Va Lerie*, 424 F.3d 694, 705 (8th Cir. 2005) (by surrendering the custody of the bag to Greyhound a defendant could reasonably expect that the bag would be handled, moved around, and even be taking off the bus).

In this case, upon information and belief, luggage was moved away from the bus and subjected to a sniff from a drug detection dog. But even if the Defendant had standing to complain, this activity does not amount to a Fourth Amendment seizure. *Id.; United States v. Garcia*, 42 F.3d 604 (10th Cir. 1994) (no Fourth Amendment violation where dog sniffed luggage in train's baggage car); *United States v. Gault,* 92 F.3d 990, 992 (1996) (additional citation omitted) (agent kicked and lifted bag); *United States v. Ward*, 144 F.3d 1024, 1033 (1998) (defendant's bag was not "seized" when agent handled and removed bag from bus luggage compartment). Additionally, SA Perry was not provided a tip from the National Security Agency or from any other source as suggested by the Defendant. Defendant is mistaken when he alleges that SA Perry pre-searched his bag and that SA Perry was standing by his seat

waiting for him when he re-boarded the bus. As previously stated, no bag was pre-searched and SA Perry encountered the Defendant while the Defendant was already in his seat. Defendant is further misguided when he refers to SA Perry's "intent" and his alleged determination to search Defendant's bag. As previously stated, an agent's subjective intent is irrelevant for Fourth Amendment purposes. *Whren,* 517 U.S. at 813. What is dispositive, to the contrary, is how SA Perry objectively acquitted himself during his encounter with the Defendant.

### III. INDEPENDENT SOURCE DOCTRINE

Even if the Court were to find a violation for any pre-consent inspection and infers that SA Perry did the same to Defendant's bag on the bus - despite the evidence to the contrary – the physical evidence should still be admitted because the search subsequent to Defendant's consent represents an independent source of evidence. *United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008).

### **CONCLUSION**

The Court should find that the encounter with the Defendant was consensual and that Defendant provided a valid consent to search his bag. In the alternative, the Court could also find that reasonable suspicion developed to detain the defendant. Accordingly, the United States moves the Court to deny Defendant's Motion to Suppress Evidence.

Respectfully submitted,

STEVEN C. YARBROUGH
Acting United States Attorney

<u>Electronically filed 3/19/2014</u>
DAVID M. WALSH
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to defense counsel.

<u>Electronically filed March 19, 2014,</u>
DAVID M. WALSH
Assistant United States Attorney