## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

         **Plaintiff,**

vs.                                     **Cr. No. 13-3140 JCH**

LEBAHIM ULISES MORENO-RUBIO,

         **Defendant.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on *Defendant's Motion To Suppress.* [Doc. 28] The Government filed a Response [Doc. 31], and Defendant filed a Reply [Doc. 34]. On May 15, 2014, the Court held an evidentiary hearing on the Motion.

The Court has reviewed the pleadings, the evidence presented at the hearing, and the relevant law. The Court will deny the Motion.

## PROCEDURAL BACKGROUND

Defendant was indicted on one count of possession with intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin. 21 U.S.C. § 841(a)(1), (b)(1)(B). [Doc. 11] Defendant filed a motion to suppress all evidence obtained directly or indirectly on September 8, 2013. [Doc. 28]

Defendant was present and represented by counsel at the May 15, 2014 evidentiary hearing. The Government presented testimony by DEA Special Agent Jarrell Perry and Albuquerque Police Department Detective Jonathan Walsh. The defense presented testimony by James Dean, Jonathan Riley, and Defendant Moreno-Rubio. The Court admitted Government's

Exhibits 1-9 and Defendant's Exhibits A-G.[1]  Defendant played portions of Exhibit A, a DVD recording by Greyhound of the passenger side of the bus taken inside the building containing the service bay and wash bay.  [Transcript of 5/15/14 hearing, pp. 74-109 (hereinafter "Tr.")]

## FINDINGS OF FACT

On September 8, 2013, Special Agent Jarrell Perry and Detective Jonathan Walsh were conducting routine drug interdiction at the Albuquerque Greyhound Bus Station, during the sixty- to sixty-five-minute layover of the bus on which Defendant was traveling.  [Tr. 22, 49; 140]  Perry and Walsh were wearing plain clothes.  [Tr. 23-24, 152]  Both Perry and Walsh had their sidearms on them, concealed.  [Tr. 24, 152]  Defendant never saw that Perry had a weapon. [Tr. 247]

Perry's normal duty is performing interdictions.  [Tr. 15]  Walsh is a detective with the Albuquerque Police Department, assigned to the DEA Task Force.  [Tr. 136]  Perry described his customary approach as boarding the bus and trying to speak with all of the passengers— displaying his DEA badge, identifying himself as a police officer, and asking for permission to speak with them.  [Tr. 16, 27, 126]  If they give him permission, he asks questions about travel and might ask for tickets or identification.  [Tr. 16]  He then asks whether they have luggage and requests consent to search their luggage and their persons for contraband.  [Tr. 15-16]  Perry purposely speaks quietly during these encounters, in part so that most of the passengers will not hear him identify himself as a police officer before he approaches them.  [Tr. 46, 78-79]  Perry tries to follow his standard procedure in all of his encounters, and did so on September 8, 2013. [Tr. 17, 27]

---

[1] In its written Response and at the beginning of the May 15th hearing, the Government objected to the Greyhound DVD (Exhibit A) on the ground that it was not relevant.  [Doc. 31, pp. 1-2; Tr. 5, 73-75]  After the hearing, however, the Government advised the Court by email that it had no objection.

On September 8, 2013, Perry and Walsh inspected luggage stored in the cargo bays underneath the bus.  [Tr. 57, 89-91; Exhibit A]  They checked tags and moved some luggage. [Tr. 57, 90; Exhibit A]  Perry looked at the passenger list, which sometimes indicates where passengers' trips originated.  [Tr. 95-96]  Sometimes the agents squeeze bags to conduct a sniff; Perry did not recall doing so in this case, and the DVD does not show such action.  [Tr. 62; Exhibit A]

Walsh smelled marijuana as soon as they looked into one of the cargo bays.  [Tr. 142] Perry and Walsh then took five bags out of that cargo bay and to the rear of the bus—not "off camera," but in view of a different camera, outside.[2]  [Tr. 59-61, 92, 144-45; Exhibit A]  Walsh, a certified canine handler, conducted a canine sniff on those five bags.  [Tr. 61, 137-38, 145-46] The dog alerted to one bag—which is unrelated to Defendant's case.  [Tr. 97, 146-47]

After checking the cargo bays, Perry and Walsh went into the passenger compartment of the empty bus; they were there by themselves for about ten minutes.  [Tr. 63-64]  Their customary procedure at this time is to look at bags and name tags and sometimes sniff bags.  [Tr. 64]  They can smell a bag without squeezing it;  Perry testified that he knew they were not permitted to manipulate a bag, but were permitted to sniff a bag and push the sides to see whether it emits an odor.  [Tr. 65]  Perry could not recall what they did on this particular occasion, or whether they had moved any bags.  [Tr. 64-65]  Perry testified that they did not open or pre-search any bags inside the bus.  [Tr. 66]  Walsh testified that he did not open or pre-search any bags while they were inside the bus, because that is illegal, and also testified that he did not see Perry open or pre-search any bags.  [Tr. 151]

In accordance with their normal procedure, Perry and Walsh were already on the bus when passengers started to reboard; Walsh usually conducts encounters with passengers in the

---

[2] Defense Counsel informed the Court that he had not obtained a recording from the outside camera.  [Tr. 60]

front half of the bus, and Perry customarily approaches passengers in the rear half.  [Tr. 26, 104, 152-53]  Defendant was toward the back of the line for reboarding.  [Tr. 236]  Before contacting Defendant, Perry had spoken with between two and five other passengers who had already boarded and were in the rear of the bus; Perry had asked them the same things he asked all of the passengers—including requesting consent to search their luggage and their persons for contraband.  [Tr. 27-29]  None of those passengers had claimed a black Nike duffel bag as theirs; this bag was in the overhead luggage rack one row behind Defendant's seat.  [Tr. 27-29]

When Perry approached Defendant, Defendant had boarded and was in his seat, four or five rows from the rear.  [Tr. 29, 106]  Perry displayed his badge, identified himself as a police officer, and asked—in English—for permission to speak with Defendant.  [Tr. 30]  When Defendant did not respond, Perry asked whether he spoke English; Defendant responded, "a little bit."  [Tr. 30-31]  Perry then asked—in Spanish—whether Defendant spoke Spanish; Defendant answered "yes" and Perry conducted the remainder of the conversation in Spanish.  [Tr. 31, 35]

Perry again displayed his badge, again identified himself—in Spanish this time—as a police officer, and asked permission to speak with Defendant.  [Tr. 31, 255]  If a passenger does not wish to speak with him, Perry does not speak with that passenger.  [Tr. 28]  Defendant consented to speak with Perry.  [Tr. 31, 255]

When Perry asked Defendant's destination, Defendant handed Perry his Greyhound bus ticket.  [Tr. 32, 235]  The ticket showed a destination of Fort Wayne, Indiana.  [Tr. 33]  After handing Perry the ticket, Defendant said "Fort Wayne."  [Tr. 33]  Perry gave the ticket back to Defendant after briefly looking at it.  [Tr. 34, 45, 256]

Perry then asked Defendant where he began his trip, and Defendant said Phoenix.  [Tr. 34, 257]  Perry knew, from his three years of working interdiction at Greyhound, that Phoenix is a source city for illegal narcotics.  [Tr. 34]

Defendant testified that Perry asked him for identification, which Defendant gave him, and which Perry gave back after holding it very briefly.  [Tr. 239, 253, 257]  Perry testified that he sometimes asks passengers for identification, but did not testify that he did so with Defendant. [Tr. 16]

Perry asked Defendant whether he had any luggage; Defendant said he did and pointed to a small backpack on the empty seat next to Defendant.  [Tr. 34-35, 258-59; Exhibits C, D, E]  Perry requested and received consent to search that backpack, finding some food and water bottles but no clothing.  [Tr. 35, 259-60]  That raised Perry's suspicion, because passengers normally travel with some clothing, while those transporting illegal narcotics sometimes do not. [Tr. 35]  Perry returned the backpack to Defendant.  [Tr. 36]

Perry then asked for permission to search Defendant's person for contraband, and Defendant said "yes."  [Tr. 38, 121, 241]  Defendant voluntarily stood up, stepped out into the aisle, and raised his hands up in the air; Perry conducted a patdown search for contraband and found none.  [Tr. 38]  Perry then asked for consent to search Defendant's shoes for contraband; Defendant handed his right shoe to Perry, Perry searched it, found no contraband, and returned the shoe to Defendant.  [Tr. 38]  Defendant sat back down in his seat.  [Tr. 38]

Perry then asked whether Defendant had any other luggage, gesturing toward the overhead rack and then toward the area underneath the bus; Defendant said he did not.  [Tr. 36-37]  Since none of the passengers farther to the rear had claimed the black Nike duffel bag, which was on the overhead rack behind Defendant's seat, Perry took it down to see if it had a

name tag, but could not see one.  [Tr. 37, 81-82; Exhibit F]  Holding this bag, Perry asked the other passengers, farther to the rear, whether it belonged to them; then Perry asked Defendant whether the bag belonged to him and Defendant said "yes."  [Tr. 37]  Since Defendant previously said he had no other luggage, Perry asked a second time whether the bag was Defendant's, and Defendant again said that it was.  [Tr. 39, 244]  Perry asked Defendant for consent to search the bag for contraband and Defendant consented.  [Tr. 39, 245, 261]

The black Nike duffel bag had two handles held together with velcro.  [Tr. 39]  After receiving Defendant's consent to search, Perry separated the velcro handles and could then see a name tag displaying Defendant's name.  [Tr. 39, 72; Exhibit 3]  Perry unzipped the bag and found a small zippered case inside, which contained a clear plastic-wrapped bundle with layers of red grease or fluid around it.  [Tr. 39-40; Exhibits 4-5]  The red grease or fluid appeared to be a masking agent for narcotics, in Perry's experience; Perry had seen similar bundles of illegal narcotics hundreds of times.  [Tr. 41-42]  Perry estimated it was about one kilogram of narcotics. [Tr. 43]  At this time Defendant had his phone out and was looking straight ahead; in Perry's experience, usually a passenger watches as Perry searches the passenger's luggage.  [Tr. 41]

Perry then arrested and handcuffed Defendant.  [Tr. 43-45]  Perry had Defendant sit down while Walsh finished his encounters; then they removed Defendant from the bus.  [Tr. 45] The total encounter with Defendant had taken two minutes or less.  [Tr. 44]

Perry used no force on Defendant throughout the encounter.  [Tr. 44]  Perry did not block Defendant in any way.  [Tr. 44]  Perry did not raise his voice at any time, but spoke in a normal tone of voice and was polite, calm, and respectful.  [Tr. 28, 44, 166, 246]  Perry gave no commands to Defendant, but asked Defendant's permission at each point.  [Tr. 28, 44]

Perry is not fluent in Spanish, but is capable of conducting these encounters in Spanish. [Tr. 31-32, 77-78]  Although Defendant may have had to struggle to understand Perry's Spanish, Defendant was able to understand Perry sufficiently.  [Tr. 240, 257, 261, 272-73]  Defendant responded appropriately to Perry's questions.  [Tr. 128]  Defendant understood Perry's requests for consent and expressed consent at each point in the encounter.  After arrest, Perry spoke with Defendant at the DEA office—with a Spanish interpreter present—and Defendant confirmed then that he had understood Perry's conversation with him when they were on the bus.  [Tr. 267, 271-73]

Perry normally records his interactions with passengers, but the recorder's battery died so he did not successfully record his encounter with Defendant.  [Tr. 24-25, 66-68]  Walsh recorded his encounters; a CD of Walsh's encounters was admitted into evidence as Exhibit 2.  [Tr. 153]

## LEGAL STANDARDS

The exclusionary rule prohibits introduction of evidence directly obtained by a violation of the Fourth Amendment and further prohibits introduction of derivative evidence that is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)); *see Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary prohibition extends as well to the indirect as the direct products of [Fourth Amendment] invasions.").  The "core rationale" of the exclusionary rule is that this "admittedly drastic and socially costly course" is needed to deter constitutional violations by law enforcement officers.  *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  The exclusionary rule furthers Fourth Amendment rights both by deterring lawless conduct by federal

officers and by "'closing the doors of the federal courts to any use of evidence unconstitutionally obtained.'" *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (quoting *Wong Sun*, 371 U.S. at 486).

A defendant may suppress evidence deemed to be "'fruit of the poisonous tree'" by "showing the requisite factual nexus between the illegality and the challenged evidence." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (quoting *Wong Sun*, 371 U.S. at 485). "Once the defendant meets this burden, the Government may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree." *Id.* at 1109. The issue then becomes whether the derivative evidence was obtained "'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun*, 371 U.S. at 488). "Even if [the defendant] can demonstrate that the evidence resulted from the [illegality], the government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

At about the same time the Supreme Court developed the exclusionary rule, the Court announced the "independent source" doctrine, which balances the "'interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime'" by "'putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.'" *Murray*, 487 U.S. at 537 (quoting *Nix*, 467 U.S. at 443); *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *United States v. Forbes*, 528 F.3d 1273, 1278-79 (10th Cir. 2008). Exclusion of evidence that has a "wholly independent" source is not warranted because that "would put the police in a worse

position than they would have been in absent any error or violation." *Nix*, 467 U.S. at 443. The independent source doctrine is an exception to the exclusionary rule. *Id.*

A consensual search preceded by a Fourth Amendment violation may still be lawful if the consent "'was voluntary in fact under the totality of the circumstances.'" *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001) (quoting *United States v. Fernandez*, 18 F.3d 874, 881 (10th Cir. 1994)). The government bears the "heavy burden" of showing that the taint was purged by proving, under the totality of the circumstances, "a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *Id.* (internal quotation marks omitted). The court must be satisfied that the consent was "sufficiently an act of free will to purge the primary taint." *Wong Sun*, 371 U.S. at 486.

## DISCUSSION

Defendant raises two issues: (I) Whether agents "pre-searched" Defendant's luggage while passengers were off the bus during the Albuquerque layover, and (II) Whether Defendant's consent to search his black Nike duffel bag was voluntary.

## I. Claim of Pre-Search of Defendant's Luggage

Defendant had no luggage stored in the cargo bays underneath the bus. Defendant left two bags in the passenger compartment during the Albuquerque layover: a small backpack on the seat next to Defendant's, and a black Nike duffel bag in the overhead luggage rack. Defendant claims that the Greyhound DVD shows Perry and Walsh illegally manipulating bags that were stored in the cargo bays. [Doc. 28, pp. 2-5, 10; Doc. 34, p. 5; Exhibit A] Defendant asserts: "One must assume that SA Perry and Officer Walsh continued their questionable drug interdiction efforts in the passenger compartment, examining bags and luggage left there by the passengers." [Doc. 28, p. 11 (emphasis added)] Defendant suggests that the DVD also shows

Perry making illegal searches in the passenger compartment.  Defendant testified that when he reboarded in Albuquerque, his small backpack was in a different position than he left it and the zipper was closed differently.  Defendant also presented testimony by two Greyhound employees that—at several times other than September 8, 2013—they saw Perry open luggage while a bus was in the service/wash bay building.  Based on this evidence, Defendant asks the Court to infer that Perry and Walsh "engaged in a practice of pre-searching passengers' luggage" and that they "almost certainly" conducted illegal searches of luggage left in the passenger compartment on September 8th—including Defendant's black Nike duffel bag.  [Doc. 28, pp. 8, 11]

The Government responds that bags in the cargo bays were permissibly moved, checked for tags, and subjected to a canine sniff—but not subjected to any illegal manipulation.   [Doc. 31, p. 11]  The Government claims that none of the bags on the bus, whether stored in the cargo bays or in the passenger compartment, was illegally searched.  [Doc. 31, p. 11]  And even if the Court were to find an illegal pre-search of Defendant's luggage, the Government argues, the heroin should not be excluded because the search pursuant to Defendant's consent provided an independent source for the evidence.  [Doc. 31, p. 12]

If the Court were to find, as Defendant asserts, that there was an illegal pre-search of Defendant's black Nike duffel bag, that would not end the Court's analysis.  This is not a case consisting simply of a search of a bag and discovery of contraband.  Instead, events continued with Defendant reboarding the bus, Defendant giving consent to search his black bag, and that consensual search resulting in discovery of the heroin.  If there were an illegal pre-search of Defendant's black bag, there were two searches:  a pre-search, followed by a later consensual search.  Defendant claims that he was "targeted" as a result of an illegal pre-search, which tainted his consent.  [Doc. 28, p. 13; Doc. 34, pp. 2-3, 6]  The Court understands Defendant's argument

to be that there was an unconstitutional pre-search of Defendant's black bag, and that because of this illegal act Perry targeted Defendant and obtained Defendant's consent to search that bag; so understood, Defendant's claim is that the heroin should be suppressed as fruit of the poisonous tree.

The Government argues that Defendant has no reasonable expectation of privacy in cargo bay luggage belonging to other persons and that Defendant therefore lacks "standing" to base his argument on assertions of illegal searches of cargo bay luggage.[3]  [Doc. 31, pp. 1-2]  The Court agrees that Defendant cannot argue that the "poisonous tree" was the alleged searches of cargo bay luggage; such searches would not have violated Defendant's Fourth Amendment rights.  *See United States v. Jarvi*, 537 F.3d 1256, 1259-60 (10th Cir. 2008).  But, as the Court understands Defendant's argument, the "poisonous tree" is not cargo bay searches, but instead the alleged pre-search of Defendant's own luggage.  Defendant's argument is that, if agents illegally searched cargo bay luggage, the Court should infer that they also illegally pre-searched luggage stored in the passenger compartment.  Defendant is attempting to use a factual allegation (searches of cargo bay luggage) to support a factual inference (pre-search of Defendant's luggage).  If the Court were to find that there was a pre-search of Defendant's black bag, then Defendant could argue that that the agents used information gained from this pre-search to target Defendant by approaching him and requesting consent to search his luggage.  The "poisonous tree" in Defendant's argument is not an illegal cargo bay search, but an illegal pre-search of Defendant's

---

[3] Although caselaw sometimes uses the term "standing" in this context, the Tenth Circuit observed that is a misnomer; when a defendant claims that evidence was obtained as the indirect result of illegal conduct, he must show that conduct violated his own constitutional rights as a matter of substantive Fourth Amendment law.  *United States v. Jarvi*, 537 F.3d 1256, 1259 n.2 (10th Cir. 2008); *United States v. Jimenez*, 336 Fed. Appx. 798, 800 (10th Cir. 2009) (unpublished); *cf. United States v. Olivares-Rangel*, 458 F.3d 1104, 1117-19 (10th Cir. 2006) (holding that defendant must show primary illegality violated defendant's Fourth Amendment rights but need not have standing in items he seeks to suppress as fruit of poisonous tree); *United States v. Mosley*, 743 F.3d 1317, 1322-23 (10th Cir. 2014) (holding defendant lacked standing to directly challenge search of car but could seek to suppress gun found in car search as fruit of defendant's seizure).

black Nike duffel bag; the "fruit" is the heroin found pursuant to a consensual search that Defendant claims was tainted because it was an exploitation of that illegal pre-search.

**A.  Fruit of the poisonous tree**

Defendant both possessed and exhibited a reasonable expectation of privacy in his luggage, the two opaque bags.  *See Bond v. United States*, 529 U.S. 334, 338 (2000).  Defendant argues that the Court should suppress the heroin because agents violated his Fourth Amendment rights by conducting an illegal pre-search of his black Nike duffel bag, and then exploited that violation when they approached Defendant and obtained consent to search that bag.

To suppress the heroin as the fruit of an unlawful search, Defendant must show, first, that there was an unlawful search which violated Defendant's Fourth Amendment rights, "and, second, that 'a factual nexus' exists between [the unlawful search] and the challenged evidence." *United States v. Mosley*, 743 F.3d 1317, 1323 (10th Cir. 2014) (quoting *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001)); *see United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) ("For evidence to be suppressed, [the defendant] must first demonstrate that his Fourth Amendment rights were violated.").  Tenth Circuit caselaw puts the burden on Defendant to make these showings:  "Our precedents . . . place the burden on the defendant to demonstrate a 'factual nexus' between a violation of his own Fourth Amendment rights and the discovery of the challenged evidence." *United States v. Jarvi*, 537 F.3d 1256, 1259 (10th Cir. 2008); *see United States v. Sanchez*, 608 F.3d 685, 691 (10th Cir. 2010).  "Evidence will not be suppressed as fruit of the poisonous tree unless an unlawful search is *at least* the but-for cause of its discovery." *United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006); *see Torres-Castro*, 470 F.3d at 999 ("'But for' causality is a necessary, but not a sufficient, requirement for suppression.").  "To establish the factual nexus, at a minimum, 'a defendant must adduce evidence at the suppression

12

hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'"  *Chavira*, 467 F.3d at 1291 (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)) (explaining that the Tenth Circuit describes the "but-for relationship" as "'a factual nexus between the illegality and the challenged evidence'").

The Tenth Circuit describes its approach as a "burden-shifting scheme." *United States v. Ladeaux*, 454 F.3d 1107, 1110 (10th Cir. 2006); *see Nava-Ramirez*, 210 F.3d at 1131.  It is not until after the defendant carries the burden of establishing both a Fourth Amendment violation and a "factual nexus" that the burden shifts to the government to show that evidence should not be suppressed because an exception to the exclusionary rule applies:

> To "successfully suppress evidence as the fruit of an unlawful detention, a defendant <u>must first establish</u> that the detention did violate his Fourth Amendment rights.  The defendant <u>then bears the burden</u> of demonstrating a factual nexus between the illegality and the challenged evidence.  <u>Only if the defendant has made these two showings</u> must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."

*Ladeaux*, 454 F.3d at 1111 (emphasis added) (quoting *Nava-Ramirez*, 210 F.3d at 1131); *see Sanchez*, 608 F.3d at 691.

In this case, Defendant was required to first establish that there was a pre-search of his black bag, and was also required to bear the burden of demonstrating that the heroin would not have been discovered but for that pre-search.  Only if Defendant made these two showings would the burden shift to the Government to show that the heroin should not be suppressed under the independent source exception to the exclusionary rule.

Defendant presented four pieces of evidence in an attempt to show that there was an unlawful pre-search of his black Nike duffel bag:  (1) the DVD allegedly showing illegal searches; (2) Defendant's testimony that the zipper on his other bag, the small backpack, was closed differently when he reboarded; (3) James Dean's testimony that he had—at another time—seen Perry opening luggage; and (4) Jonathan Riley's testimony that he had—at another time—seen Perry opening luggage.  Based on this evidence, Defendant asks the Court to infer that Perry and Walsh "engaged in a practice of pre-searching passengers' luggage" and that the agents "almost certainly" conducted illegal searches of bags left in the passenger compartment on September 8th—including Defendant's black Nike duffel bag.  [Doc. 28, pp. 8, 11]

In *Bond*, a Border Patrol agent boarded a bus at a permanent checkpoint, satisfied himself that the passengers were lawfully in the United States, and then walked to the front of the bus and "squeezed the soft luggage which passengers had placed in the overhead storage space above the seats."  *Bond v. United States*, 529 U.S. 334, 337 (2000).  The agent noticed that one bag contained a "brick-like" object; the defendant admitted the bag was his and agreed to allow the agent to open the bag.  The "brick" turned out to be methamphetamine.[4]  *Id.* at 336.  The Supreme Court held that, although a bus passenger "clearly expects that his bag may be handled," he "does not expect that other passengers or bus employees will, as a matter of course, feel the bag in an exploratory manner."  *Id.* at 338-39.  The Court stated that the agent had conducted "a probing tactile examination" of the bag.  *Id.* at 337.  This manipulation "in an exploratory manner" constituted a search, which was illegal.

In *Nicholson*, drug interdiction officers checked bus luggage during a regularly scheduled stop.  *United States v. Nicholson*, 144 F.3d 632, 634 (10th Cir. 1998).  One detective testified

---

[4] The Government did not argue in *Bond* that this consent allowed admission of the methamphetamine.  529 U.S. at 336 n.1.

that he "manipulated" a bag and detected "tightly wrapped bundles" inside which he believed to be drugs. *Id.* at 639. The Tenth Circuit recognized that there is no reasonable expectation that a bag would not be pushed and moved, but held that the detective conducted an illegal search by "manipulating Defendant's bag in a manner that Defendant did not reasonably expect from other passengers." *Id.* "The degree of intrusion is the determining factor . . . ." *Id.* There was "a tactile examination . . . aimed at discovering the nature of the contents of the bag." *Id.* (internal quotation marks omitted). A second piece of luggage was checked in *Nicholson*, with that detective testifying that he "'initially' felt the sides of the bag with his palms perpendicular to the ground and flat, and detected 'several large bundles' inside it." *Id.* He then smelled marijuana in the bag. *Id.* The Tenth Circuit again held that this was an illegal search, because the detective had pressed on the sides of the suitcase with his palms in order to inspect its contents. *Id.* at 640. The Tenth Circuit distinguished the type of handling in *Nicholson* from other cases in which the officers "gently pressed on the sides of the bags in order to circulate the air in preparation for a sniff, human or dog"; this handling was "minimally intrusive." *Id.*

Defendant asserts that the Greyhound DVD shows Perry and Walsh manipulating bags from the cargo bay in a manner "similar" to the manipulation held to be an unconstitutional search in *Nicholson*; Defendant claims the DVD shows "repeated violations of *Bond*" and "obviously unconstitutional actions." [Doc. 28, p. 10; Doc. 34, pp. 2-3, 5] The Court has reviewed the DVD and disagrees with Defendant's assertions; the Court finds that the DVD does not show any illegal manipulation or searching.[5] The Court finds that the DVD shows Perry and Walsh moving luggage in the same way one would expect another passenger to move bags—

---

[5] For ease of reference in this Memorandum Opinion and Order, the Court uses the term "search" to include both actually unzipping or otherwise opening up a piece of luggage and the type of probing exploratory manipulation held to constitute a search in *Bond* and *Nicholson*. The Court uses the term "pre-search" to refer to an illegal search of Defendant's luggage which Defendant claims occurred while Perry and Walsh were alone in the passenger compartment, before passengers reboarded.

which does not constitute a search according to *Bond* and *Nicholson*.  Agents are permitted to check tags and attempt to match luggage with passengers; they are permitted to move luggage in order to conduct a canine sniff—provided that they only handle the bags in the same way that another passenger might, and do not conduct any probing tactile examination.  *Bond*, 529 U.S. at 338-39; *United States v. Drayton*, 536 U.S. 194, 198 (2002) (approving interdiction procedure in which agents sought to match bus passengers with luggage in overhead racks).  The Court finds no evidence on the DVD that Perry and Walsh were doing anything unconstitutional with cargo bay luggage.

Defendant also speculates that the video shows evidence of "mischief" in gestures by Perry, again actions relating to the cargo bay:  (1)  Perry gesturing "in a way that can only be construed as 'nothing was found'"; and (2) Perry pointing at a Greyhound employee, allegedly warning employee "don't say a word."  [Doc. 28, pp. 10-11]  Defendant baldly speculates:  "The employee must have said something to the effect of 'I didn't see anything.'"  [Doc. 28, p. 11]  Perry testified that he did not remember what was going on at these times.  [Tr. 93]  Having reviewed the DVD, the Court finds that these gestures do not suggest any unconstitutional manipulation or searching or cover-up.

Defendant expresses suspicion about what Perry and Walsh did "off-camera" with the bags removed from the cargo bays, asserting that "the only reason to hide one's conduct is because that conduct is illegal."  [Doc. 28, p. 8]  Perry and Walsh took five bags outside the building, where Walsh conducted a canine sniff.  Walsh testified that they took the bags outside because space and time were limited inside and they tried to avoid interfering with Greyhound employees working around the bus.  [Tr. 143-44]  The dog alerted to one bag with a claim check in the name of Jesse Zeitz.  [Tr. 146]  This bag was not claimed by any of the passengers on the

16

bus.  [Tr. 146]  A search warrant was obtained, and marijuana was then found inside the bag. [Exhibit 1; Tr. 147-49]  The Court finds no indication of any unconstitutional manipulation or searching as a result of the time Perry and Walsh and those five bags were outside the view of the camera from which the DVD was obtained.  The Court notes that there is another camera outside the service/wash bay building, which Perry and Walsh testified would have shown what they were doing at this time.  [Tr. 59-61, 92, 126-27, 145]  Defense Counsel informed the Court that he had not obtained a recording from this camera.  [Tr. 60]  The Court finds no support for Defendant's speculation that something illegal was going on when Perry and Walsh moved outside the view of the camera inside the building.

Based on his assertion that the DVD shows unconstitutional searches of cargo bay luggage, Defendant asks the Court to infer that Perry and Walsh also unconstitutionally searched bags left inside the passenger compartment—including Defendant's bag.  Since the Court finds that the DVD shows no illegal searching of cargo bay luggage, such an inference is of course unwarranted.

Defendant also suggests that the DVD shows that Perry was pre-searching Defendant's bag while Perry and Walsh were in the passenger compartment, arguing that "Officer Perry displays a significant amount of movement in the rear of the bus, proximate to Defendant's seat and bags."  [Doc. 28, p. 5 n.2; Doc. 28, pp. 8, 11; Doc. 34, pp. 5-6; Tr. 103; Exhibit A]  Having viewed the DVD, the Court finds that it does appear to show Perry moving around inside, but it does not show that Perry manipulated or pre-searched any luggage.  Perry could be moving luggage to check tags and attempting to match luggage with passengers in the way permitted by the Fourth Amendment.  *See Bond*, 529 U.S. at 338-39; *Drayton*, 536 U.S. at 198.  But the quality of the DVD does not allow the Court to make any finding of what Perry was doing, other

17

than moving around.  The Court finds that this portion of the DVD provides no support for Defendant's assertion that Perry pre-searched Defendant's luggage.

In addition to the DVD, Defendant presented testimony from three witnesses to support his claim of illegal pre-searching.

Defendant Moreno-Rubio testified that when he reboarded, his small backpack was in a different position on the seat than the way he had left it.  [Tr. 237-38]  This testimony does not show the backpack was searched; if it was moved, that could be merely the type of handling permitted under *Bond*.  *See Bond*, 529 U.S. at 338-39 (holding there is no unconstitutional search when luggage is moved in same way as another passenger might be expected to do—e.g., picking it up or moving it to another position).  Defendant also testified that the zipper on his small backpack was closed, but in a different place than he normally closed it.  [Tr. 237-38] Defendant gave no testimony that his black Nike duffel bag had been moved or searched.

Defendant also presented testimony from two Greyhound employees that they had—on other dates, and on other buses—seen Perry open and search luggage.  James Dean testified that in seven years of working at Greyhound, on "maybe two at most" occasions he had seen an officer open up a cargo bay bag; he could not remember any date or year, but identified Perry as one of the officers who would open up bags.  [Tr. 171-175]  Jonathan Riley testified that:  on December 16, 2012, he was cleaning inside a bus when he saw Perry open a bag and take three bears out; Perry asked him whether he would think there were drugs inside; and then Perry put the bears back into the bag and zipped it up and put the bag back where he found it.  [Tr. 193-94] Riley testified that in March 2013 he saw Perry open a long black box that had been in the cargo bay and take out a cream-colored brick; Riley testified that Perry then closed up the box and put it back into the cargo bay.  [Tr. 196-97]  Riley testified that on August 11th, he was entering the

bus to clean when he heard a sound like a bag being zipped up and he saw Perry walking toward the back of the bus.  [Tr. 199-200]  On cross-examination, Riley admitted that in another hearing he had testified that the first incident occurred on January 17, 2013, and that was actually the correct date.  [Tr. 203-209]  The Government presented Exhibits 6 through 9 to impeach Riley's recollection of details of these incidents.  [Tr. 219-22]

Perry testified that he did not pre-search Defendant's luggage; he testified that he knew from his training that was not allowed under the law, and he would not risk his career by illegally searching luggage.  [Tr. 128]  Walsh testified that he did not open or search any luggage while he and Perry were inside the bus, because that is illegal; Walsh also testified that he did not see Perry open or search any bags.  [Tr. 151]

Perry and Walsh were inside the passenger compartment, by themselves, for about ten minutes.  [Exhibit 1; Tr. 63-64, 161]  Perry testified that he could not remember specifically what he was doing at that particular time, but his customary procedure is to look at bags and name tags and sometimes sniff bags.  [Tr. 100-03, 64]  Walsh testified that their practice is to board the bus and briefly examine luggage in overhead racks.  [Tr. 150]  Often they ride the bus back to the loading dock, after briefly examining bags inside, and just wait for passengers to reboard.  [Tr. 150]  While the bus is being washed or moved, agents are unable to get off and must wait inside.  [Tr. 150]  Defendant contends that there "is no legitimate explanation for the officers' prolonged presence aboard the bus."  [Doc. 34, p. 5]  The Court finds instead that Perry's and Walsh's testimony showed legitimate reasons to be in the passenger compartment.

Defendant makes three additional factual assertions in an attempt to support his claim that he was targeted based on a pre-search.  The Court finds to the contrary on these three points.  First, Defendant asserts "that neither officer made an arrest of the owners of any of the other

bags that were pre-searched."  [Doc. 34, p. 4]  In addition to making an unsupported assumption that any bags were pre-searched, this assertion does not present a full and accurate picture; although agents were unable to locate the owner of a cargo bay bag to which the dog alerted, and thus were unable to make an arrest, they did obtain a search warrant and proceed as far as they were able to go with that investigation at the time.  [Tr. 146-49; Exhibit 1 (search warrant for bag with claim check for "Jesse Zeitz")]  Second, Defendant asserts that he "was essentially the only person confronted by the officers, and his bag the only bag searched by the officers," and, somewhat inconsistently, that the officers displayed "keen focus on two distinct passengers and disinterest in everyone else."  [Doc. 34, p. 5; Doc. 28, pp. 12-13]  The Court disagrees.  The Court finds that Perry and Walsh approached, questioned, and requested consent to search from the other bus passengers, in accordance with their customary procedure to attempt to speak to all passengers.  Defendant himself testified that Perry spoke with other passengers.  [Tr. 240-44, 260]  Third, Defendant asserts:  "The fact that SA Perry was waiting right beside [Defendant's] bag when passengers began the reboarding process suggests that SA Perry had pre-searched his bag."  [Doc. 28, pp. 11-13]  The Court finds, instead, that Perry had already spoken with two to five other passengers who had already boarded and were seated in the rear of the bus.  [Tr. 27-29]  Since Defendant was toward the back of the line for reboarding, [Tr. 236] Perry had already conducted encounters with these other passengers and had already asked them for consent to search their luggage and their persons for contraband.  [Tr. 27-29]  After Defendant reboarded and sat down, four or five rows from the back, Perry approached Defendant.  [Tr. 29, 106]  The timing of Perry's approach to Defendant was merely the result of Defendant's position at the back of the line for reboarding and Defendant's seat toward the back of the bus.

The Court finds that the credible evidence, considered individually and as a whole, does not show that there was a pre-search of Defendant's luggage.  To find that there was such a search would constitute an unwarranted leap from the evidence presented.  The Court finds that Defendant's claim of an illegal pre-search does not rise above mere speculation.

Under Tenth Circuit precedent, it is Defendant's burden to "first demonstrate that his Fourth Amendment rights were violated" by showing that there was an illegal pre-search. *Torres-Castro*, 470 F.3d at 999; *see Nava-Ramirez*, 210 F.3d at 1131.  Defendant does not carry this burden by "assuming" or suggesting that agents "almost certainly" pre-searched his luggage. [Doc. 28, pp. 8, 11]  Since Defendant failed to make this showing, Defendant also failed to carry the second part of his burden—"to demonstrate a 'factual nexus' between a violation of his own Fourth Amendment rights and the discovery of the challenged evidence."  *Jarvi*, 537 F.3d at 1260.  "'At a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'"  *United States v. Collins*, 534 Fed. Appx. 743, 748 (10th Cir. 2013) (unpublished)[6] (quoting *Nava-Ramirez*, 210 F.3d at 1131).  As discussed more fully below in Section I(B) (discussing independent source exception), Defendant failed to make even a "but for" showing, because the Court finds that the agents followed their customary procedure of approaching all passengers, questioning them and requesting consent to search their luggage; the Court finds that Perry would have approached Defendant and requested—and obtained—consent to search the black Nike duffel bag at any event.

In cases in which defendants similarly failed to carry their burden of proof, the Tenth Circuit affirmed denial of motions to suppress evidence as fruit of the poisonous tree.  When

---

[6] The Court cites this and other unpublished opinions for their persuasive value.  *See* 10th Cir. R. 32.1(A).

there is a failure of proof on critical points, the suppression motion must be denied because the burden of proof is on the defendant.

In *Jarvi*, there was a valid traffic stop of the defendant's truck. *United States v. Jarvi*, 537 F.3d 1256, 1257 (10th Cir. 2008). At some point during the stop, police requested and were refused permission to search the truck, but eventually a canine sniff led to discovery of methamphetamine in the truck; the government conceded that this methamphetamine should be suppressed because the search of the truck was illegal. *Id.* At some point during the stop, the police obtained permission from the passenger to search her purse; they found pills and arrested her on the theory that it was illegal to carry these pills without also carrying the prescription. *Id.* After the passenger was taken into custody—unlawfully, because she was arrested under a nonexistent law—she told police that the defendant had more methamphetamine in his residence; on the basis of this information, police acquired a search warrant and found methamphetamine in the defendant's residence. *Id.* The traffic stop could be divided into three parts: the initial stop (conceded to be valid), the detention after the stop, and the ultimate search of the truck (conceded to be invalid); the parties did not agree about validity of the detention. *Id.* at 1260. The Tenth Circuit observed that it had "little evidence about the relationship of the detention— even if it were shown to be illegal—to the questioning of [the passenger] that ultimately produced the search warrant." *Id.* The Court observed that the passenger's consent to search of her purse could have "occurred only because of an unconstitutionally prolonged detention of [the defendant], or because of suspicions aroused by the discovery of the drugs in [the defendant's] truck." *Id.* "But the record does not show this." *Id.* It was also possible that the officers requested and obtained consent to search the passenger's purse "during the ordinary course of the traffic stop." *Id.* The unlawful arrest of the passenger could not have been the "poisonous tree,"

because that arrest did not violate the defendant's Fourth Amendment rights.  *Id.*  The Court concluded that the defendant failed to meet his burden in district court, because he had failed to show that "if police had not illegally searched his truck (or unlawfully detained him, if that violation were shown), they would not have ended up questioning [the passenger] and learning about the drugs in his house." *Id.* at 1260-61.  The Court concluded:  "Absent *any* information presented at the hearing about whether his detention was illegal, or how the questioning of [the passenger] related to the arguably illegal detention and the concededly illegal search, we cannot conclude that [the defendant] met his burden before the district court." *Id.* at 1261.  The Tenth Circuit concluded:  "In light of the burden of proof, this lack of information dooms Mr. Jarvi's motion for suppression." *Id.* at 1260.  Since the defendant failed to carry his burden, the government was not required to prove that an exception to the exclusionary rule applied.  *Id.*

In *Chavira*, the defendant was stopped for a traffic violation.  *United States v. Chavira*, 467 F.3d 1286, 1288 (10th Cir. 2006).  The trooper checked the VIN number on the dash and then, without permission, opened the truck's door to check the VIN number on the doorjamb.  *Id.* at 1288.  The trooper returned the defendant's documents and issued a warning citation.  *Id.*  After continuing to talk with the defendant, the trooper requested and obtained permission to search the truck, discovered suspicious circumstances, and called for a canine; the dog alerted, and eight bricks of cocaine were found in the fuel tank.  *Id.* at 1289.  The Tenth Circuit rejected the defendant's claim that the cocaine was the fruit of an unlawful search—specifically, the inspection of the VIN on the doorjamb, which was conceded to be illegal.  *Id.* at 1291.  The Court agreed with the government's argument that the defendant could not rely upon the fruit of the poisonous tree doctrine because the defendant failed to demonstrate a nexus between the doorjamb VIN inspection and discovery of the cocaine.  *Id.*  Holding that the defendant, "'at a

minimum . . . must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct,'" the Tenth Circuit stated:  "There is no such evidence here."  *Id.* (quoting *Nava-Ramirez*, 210 F.3d at 1131).  Although the trooper had seen a second cell phone when he illegally opened the truck's door, the defendant failed to demonstrate that had a connection to what happened next—the request to search the truck.  *Id.* at 1292.  Instead, the Court stated:  "There is no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb."  *Id.*  Since the defendant failed to carry his burden of demonstrating a factual nexus, the cocaine could not be suppressed as fruit of the poisonous tree. *Id.* at 1291-92.

In *Lopez-Carillo*, the defendant's mother gave valid consent to search the home she shared with the defendant.  *United States v. Lopez-Carillo*, 536 Fed. Appx. 762, 767-70 (10th Cir. 2013) (unpublished).  In that search agents discovered a shotgun in plain view.  *Id.* at 765. The defendant failed to show that there was an illegal search or seizure of the shotgun, and failed to carry the first part of his burden—demonstrating a Fourth Amendment violation.  *Id.* at 767, 770.  Because of the defendant's failure to carry his burden, the Tenth Circuit did not need to reach other issues—including inevitable discovery and sufficient attenuation to dissipate any taint.  *Id.* at 770-71.

As *Jarvi*, *Chavira*, and *Lopez-Carillo* demonstrate, Defendant Moreno-Rubio cannot prevail because he failed to carry his burden of proof on either of the two points.  A lack of information or a failure of proof means that the suppression motion must be denied.  Defendant failed to demonstrate a violation of his Fourth Amendment rights, because Defendant failed to show that any pre-search of his luggage occurred.  Defendant also failed to demonstrate a factual

nexus—failing to demonstrate that "but for" an illegal pre-search Perry would not have questioned Defendant or obtained his consent to search the black bag.  *See Chavira*, 467 F.3d at 1291.  As discussed more fully below in Section I(B) (discussing independent source exception), the Court determines that the agents followed their customary procedure of approaching and questioning all passengers, and requesting consent to search their luggage.  The Court finds that Perry would have approached Defendant and requested—and obtained—consent to search his black Nike duffel bag as part of Perry's normal interdiction routine.  *See Jarvi*, 537 F.3d at 1260-61 (holding that defendant failed to show that police would not have questioned passenger and obtained information from her if they had not illegally searched defendant's truck or illegally prolonged defendant's detention); *Sanchez*, 608 F.3d at 692 (holding defendant failed to carry his burden of showing "but for" causation, because police would have discovered the marijuana in the garage at any event as part of their normal routine in conducting a home visit of a probationer); *United States v. Coulter*, 461 Fed. Appx. 763, 766 (10th Cir. 2012) (unpublished) (holding that defendant failed to carry burden of showing "factual nexus," because reasonable police officers would nevertheless have investigated by knocking on door of house and would still have asked woman for identification and followed her inside and seen marijuana).

Since Defendant failed to carry either part of his burden, Defendant cannot prevail on his claim that the heroin should be suppressed as fruit of the poisonous tree.

### B.  Exceptions to exclusionary rule

Under the "burden-shifting scheme" of the Tenth Circuit, the burden did not shift to the Government because Defendant failed to carry his initial burden.  *Ladeaux*, 454 F.3d at 1110; *see Nava-Ramirez*, 210 F.3d at 1131; *Sanchez*, 608 F.3d at 691.  The Court therefore need not reach the issue of whether an exception to the exclusionary rule applies in this case.  The Court will

nevertheless address two relevant theories under which exclusion of the heroin would still not be warranted.

### (1)  Exploitation and taint

The government "may still avoid suppression by proving that the contested evidence is not fruit of the poisonous tree" because it was not obtained by exploitation of illegality. *Olivares-Rangel*, 458 F.3d at 1109.  Exclusion is not warranted if the government can establish that it "has been purged of the primary taint" because its discovery "was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  *Id.*; *see Torres-Castro*, 470 F.3d at 999.  The ultimate question is whether the evidence was obtained by exploitation of an illegality. *Nava-Ramirez*, 210 F.3d at 1131 n.1.

Assuming arguendo that there had been an illegal pre-search, the Court concludes that the Government carried its burden to prove that the heroin was not fruit of the poisonous tree by demonstrating that Defendant's consent was not tainted by such a pre-search.  *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1054-55 (10th Cir. 1994); *United States v. Fox*, 600 F.3d 1253, 1259-60 (10th Cir. 2010).  The Tenth Circuit stated that the district should consider the *Brown* factors in determining whether there is any taint from an illegal search.  *Brown v. Illinois*, 422 U.S. 590 (1975); *Melendez-Garcia*, 28 F.3d at 1054.  *Brown* holds that *Miranda* warnings alone do not ensure that a confession following an illegal arrest has not been unduly exploited under *Wong Sun*, but a court must determine whether the confession was tainted by considering all of the circumstances—including:  "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct."  *Brown*, 422 U.S. at 603-04 (footnotes and citation omitted).  Although *Brown* is sometimes cited as though it set forth a three-factor test, the Supreme Court

26

emphasized that it was not establishing a rigid or "talismanic" test, consisting only of these three factors—but instead stated that all circumstances must be considered and "[n]o single fact is dispositive." *Id*. at 603-04. The inquiry is fact-specific, and a court is required "to undertake the inquiry mandated by *Wong Sun* to evaluate the circumstances of [the] case in the light of the policy served by the exclusionary rule." *Id*. at 604-05 (concluding with the caution that the Court's holding "is a limited one").

The *Brown* Court was concerned with different facts: illegal arrest of the defendant, at gunpoint—an illegality of which the defendant was obviously aware. In Defendant Moreno-Rubio's case, the three *Brown* factors are not the most important factors, because of a critical factual distinction: Defendant Moreno-Rubio was not aware of any alleged pre-search, and Defendant's arguments to this Court do not claim otherwise. The separation in time and consideration of intervening events were particularly relevant in *Brown* to determining whether there was a causal connection; in addition, *Brown's* consideration of the third factor, the purpose and flagrancy of the alleged misconduct, focused on whether the illegal arrest had the effect of causing Brown to confess. *Brown*, 422 U.S. at 605. Although these factors are largely insignificant in Defendant Moreno-Rubio's case, the Court has taken them into account.

First, an illegal pre-search could not have made any difference to Defendant's decision to grant consent to search his black bag. Since Defendant knew nothing of any pre-search, such illegality could not have any coercive effect on Defendant; a pre-search did not cause Defendant to consent.[7] Second, the Court finds there was no causal connection between any illegal pre-search and Perry's decision to request Defendant's consent to search his black Nike bag.

---

[7] Defendant claims that an illegal pre-search affected Perry's manner—that Perry "was determined to search" Defendant's bag, "acted in [a] way that left [Defendant] no choice but to concede," and "demanded permission to search." [Doc. 28, pp. 11, 14] This claim is relevant to the issues of voluntariness and coercion (addressed in Section II, below), not to the fruit of the poisonous tree claim.

Whether Perry's decision was motivated by illegally obtained information is a question of fact. *See United States v. Siciliano*, 578 F.3d 61, 69 (1ˢᵗ Cir. 2009) (recognizing as factual issue whether agents' decision to seek warrant was prompted by unlawfully acquired information); *United States v. Hernandez*, 279 F.3d 302, 309 (5ᵗʰ Cir. 2002) (stating that it was a factual question whether officer's decision to approach defendant and request consent to search suitcase was result of prior illegal manipulation of suitcase). The Court finds that, in accordance with his customary interdiction procedure, Perry would have approached Defendant and requested consent to search the black bag at any event; the Court finds that Perry's decision to question Defendant and ask for consent to search Defendant's luggage was not motivated by any pre-search.

The Court must consider all of the facts and circumstances, and must keep in mind that the ultimate issue is whether there was any exploitation of an illegal pre-search. Assuming arguendo that a pre-search were proved, the Court finds no causal connection between an illegal pre-search and Defendant's consent; therefore, there was no exploitation, no taint from an illegality, and no justification for exclusion of the heroin.

### (2) Independent source exception

The Government argues that, even if there had been an illegal pre-search of Defendant's luggage, the heroin should not be excluded because the search pursuant to Defendant's consent was an independent source for the evidence. The Government has the burden of proving, by a preponderance of the evidence, that the consensual search provided an independent source for the heroin. *See United States v. Forbes*, 528 F.3d 1273, 1279 (10th Cir. 2008).

The independent source doctrine is a well-recognized exception to the exclusionary rule. *United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008); *see Murray v. United States*, 487

U.S. 533, 537 (1988); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920).  When an independent source leads agents to discovery of evidence, that evidence is not subject to suppression because suppression "'would put the police in a worse position than they would have been . . . absent any error or violation.'"  *Forbes*, 528 F.3d at 1278 (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)).  The defendant bears the burden of establishing a Fourth Amendment violation.  *Id*. at 1277.  The government then bears the burden of showing by a preponderance of the evidence that there was "truly an independent source" for the evidence.  *Id*. at 1279.

In *Forbes*, the Tenth Circuit affirmed denial of the defendant's motion to suppress marijuana.  The defendant drove his tractor-trailer rig into a permanent border control checkpoint.  *Id.* at 1275.  An agent obtained the defendant's consent to a canine sniff and then referred him to the secondary inspection area.  *Id.*  For purposes of the suppression motion, the district court accepted the defendant's testimony regarding the sequence of events in secondary and assumed arguendo that there was first an illegal search of the trailer.  *Id.*  Next, an agent ran his dog around the outside of the truck, the dog alerted to the tractor, and agents found 91.6 kg of marijuana in the tractor.  *Id*. at 1275-76.  The defendant argued that the marijuana found in the tractor should be suppressed as the fruit of an earlier illegal search of the trailer.  *Id*. at 1276. The Court disagreed, holding that the marijuana was discovered pursuant to a lawful canine inspection.  *Id*.  at 1280.  No evidence of wrongdoing was discovered by the assumed illegal entry of the trailer.  *Id*.  "Nothing that led agents to the truck's tractor was in any sense derived from the search of the trailer."  *Id*.  The marijuana discovered later was therefore not the "product of the earlier unconstitutional search."  *Id*.; *see Segura v. United States*, 468 U.S. 796, 815 (1984) (holding that evidence will not be excluded unless illegality is at least the "but for" cause of its

discovery).  The legal canine sniff was "conceptually unrelated to the search of the trailer" and was an independent source for the evidence.  *Forbes*, 528 F.3d at 1280.

Even if a defendant is unaware of a prior illegality, which could not therefore have had a coercive effect on the defendant, evidence discovered in a later consensual search may be suppressed as fruit of the poisonous tree.  Thus the Fifth Circuit affirmed suppression of heroin, after an officer had located and illegally manipulated the defendant's suitcase while it was in a bus's luggage compartment.  *United States v. Hernandez*, 279 F.3d 302, 305 (5th Cir. 2002).  The district court made a factual finding that the officer decided to approach the defendant because the officer felt something suspicious during this illegal manipulation.  *Id*. at 309.  The officer therefore boarded the bus and approached the defendant, questioning her, asking her to get off the bus with him, and requesting consent to search her suitcase.  *Id*. at 305.  She consented, and the officer discovered heroin inside the suitcase.  *Id*.  The defendant never knew that her suitcase had previously been investigated and manipulated.  *Id*. at 311.  Even though the court concluded that the defendant's consent to search was voluntary, the court upheld suppression of the heroin because the officer exploited the illegal search—deciding to approach the defendant only after and because he felt something suspicious in that illegal search.  *Id*. at 309-10.  In *Hernandez*, "the illegal search did make a difference."  *Id*. at 309.  The officer—according to the district court's factual finding—only decided to approach the defendant because of his earlier illegal manipulation of her suitcase.  *Id*.

Assuming arguendo that Defendant Moreno-Rubio had carried his burden to demonstrate an illegal pre-search of his luggage and a "factual nexus," the Government would then have the burden of showing that no information gained from an illegal pre-search affected Perry's decision to approach Defendant and ask the questions he did, including obtaining consent to search the

black Nike bag. *See Murray*, 487 U.S. at 540, 542. If an illegal pre-search prompted Perry's decision to approach Defendant and ask for consent to search, the heroin found in the black bag would not have "a genuinely independent source." *See id*. at 542. The relevant question is whether evidence was discovered through exploitation of illegal police activity. *United States v. Toledo*, 378 Fed. Appx. 799, 804 (10th Cir. 2010) (unpublished); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996).

Whether Perry's decision to approach Defendant and request consent to search was motivated by an illegal pre-search is an issue of fact. *See Siciliano*, 578 F.3d at 69; *Hernandez*, 279 F.3d at 309. The district court in *Hernandez* made a factual finding that the officer's decision to approach the defendant was motivated by his illegal manipulation of her suitcase. *Hernandez*, 279 F.3d at 309. In contrast, this Court makes an explicit finding of fact that Perry did not decide to approach Defendant because of a pre-search. The Court finds that Perry and Walsh followed their customary interdiction procedure and intended to: approach all bus passengers, ask all passengers about their luggage, and request consent to search the luggage of all passengers. Even assuming there had been an illegal pre-search, therefore, the Court finds that Perry was not motivated by, and did not exploit information from, that pre-search; instead, Defendant's consent was "truly an independent source" for the evidence. *Forbes*, 528 F.3d at 1279. In contrast to *Hernandez*, any illegal pre-search in Defendant's case "made no difference." Perry would still have approached Defendant, would still have requested consent to search, and would still have obtained consent. The Court finds that Defendant was not "targeted."

The Court notes that it does not reach this result merely because Perry testified that he would have approached Defendant and requested consent to search the black Nike bag. *See Murray*, 487 U.S. at 540 n.2 ("To say that a district court must be satisfied that a warrant would

have been sought without the illegal entry is not to give dispositive effect to police officers' assurances on the point.  Where the facts render those assurances implausible, the independent source doctrine will not apply.").  The Court instead relies on all of the evidence, including: Perry's testimony that it is his customary practice to approach all bus passengers and to request consent to search their luggage; Walsh's testimony to the same effect; Perry's testimony that he did follow his customary practice on this specific occasion, September 8, 2013, and did approach all of the bus passengers in "his" half of the bus; and Walsh's testimony that he did approach all of the bus passengers in "his" half of the bus.

Since there is no claim that Defendant knew of any illegal pre-search, such a pre-search logically could not have had any direct effect on Defendant's answers to Perry's questions, including his consent to search the black bag.[8]  The Court finds—even if there were an illegal pre-search—Defendant would still have given voluntary consent to search his black bag.

The Court is mindful of the purposes of the exclusionary rule.  Assuming arguendo that there was an illegal pre-search, the agents did not exploit or profit from that illegality.  Perry would still have obtained Defendant's consent to search as part of his customary interdiction procedure.  *See Murray*, 487 U.S. at 542; *Sanchez*, 608 F.3d at 692 (holding that police did not exploit unconstitutional search of clothes hamper or profit from that wrongdoing, because they would have discovered marijuana in garage as part of their normal routine in conducting a home visit of a probationer).

The consensual search of Defendant's black bag was "in fact a genuinely independent source."  *Murray*, 487 U.S. 542; *see Nix*, 467 U.S. at 443.  To suppress the heroin would put the

---

[8]Defendant claims that an illegal pre-search affected Perry's manner—that Perry "was determined to search" Defendant's bag, "acted in [a] way that left [Defendant] no choice but to concede," and "demanded permission to search."  [Doc. 28, pp. 11, 14]  These claims are relevant to the issues of voluntariness and coercion (addressed in Section II, below), not to the fruit of the poisonous tree claim.

Government in a worse position than if there had been no prior illegality—contrary to the independent source doctrine.  *See Murray*, 487 U.S. at 537; *Nix*, 467 U.S. at 443.

## II.  Consent

When a defendant claims that evidence from a consensual search should be suppressed as the product of unattenuated illegality, the court must address two issues:  (1) whether the consent was voluntary, and (2) whether the evidence at issue was fruit of the poisonous tree.  *United States v. Reeves*, 524 F.3d 1161, 1170 (10th Cir. 2008) (citing *Wong Sun*, 371 U.S. at 487-88); *Melendez-Garcia*, 28 F.3d at 1053.  Although there is some overlap between the two tests, they "address separate constitutional values and they are not always coterminous."  *Melendez-Garcia*, 28 F.3d at 1054.

### A.  Voluntariness of consent

For consent to search to be valid, "(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied."  *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (internal quotation marks omitted).  The Government has the burden of proving that consent was freely and voluntarily given, "'a burden that is not satisfied by showing a mere submission to a claim of lawful authority.'"  *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)).

This is a "fact-laden inquiry."  *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118 (10th Cir. 2007).  Some of the relevant factors include:

> "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons.  Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or

her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances."

*Jones*, 701 F.3d at 1318 (quoting *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011)). No single factor is dispositive. Voluntariness is a factual issue determined by evaluating the totality of the circumstances. *Guerrero*, 472 F.3d at 789; *Jones*, 701 F.3d at 1318.

The first question is whether Defendant's consent was unequivocal, specific, and freely given. Defendant does not argue that his consent was involuntary because of subjective factors such as his education level, lack of understanding of English, or mental disability. *See Jones*, 701 F.3d at 1319-20; *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir. 1993). As set forth in the Court's "Findings of Fact," the Court finds that Perry requested permission of Defendant at each step in the encounter, from a request to speak with him at the beginning to the request for consent to search the black Nike duffel bag; the Court also finds that Defendant unequivocally, specifically, and freely gave consent to each request. Defendant answered "yes" to each request. In addition, when asked for consent to search his person for contraband, Defendant, without being asked to do so, stood up in the aisle and held up his hands. *See Guerrero*, 472 F.3d at 789-90 (holding that non-verbal consent, when clear and comprehensible, constitutes "clear and positive testimony" of unequivocal, specific, and freely given consent). There was no equivocation and no ambiguity when Defendant answered "yes" to Perry's requests for permission. *See United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000). There was no hesitation. *See United States v. Zubia-Melendez*, 263 F.3d 1155, 1163 (10th Cir. 2001). Nor was there anything in the circumstances to suggest to Perry that Defendant's answering "yes" to each question did not constitute free and unequivocal consent. *See Jones*, 701 F.3d at 1317-20 (holding that focus is on whether defendant's words or actions permitted officer "to form a reasonable belief" that defendant consented, rather than merely submitted to a show of

34

authority); *Coulter*, 461 Fed. Appx. at 767 (holding consent voluntary when there was no indication that woman was submitting to a show of authority rather than freely consenting). Defendant "did not say anything to indicate that [his] cooperation was not voluntary." *United States v. Flores*, 48 F.3d 467, 469 (10th Cir. 1995).

An additional factor indicating that Defendant's consent was freely given is Defendant's testimony that he did not know there was heroin in his black Nike duffel bag, he did not know how the heroin got there, and the heroin did not belong to him. [Tr. 249-50] When a defendant does not know of any contraband inside his luggage, there is no reason for a defendant to deny consent to search. *See United States v. Hernandez*, 279 F.3d 302, 308 (5th Cir. 2002).

In his testimony at the evidentiary hearing, Defendant confirmed that he had also said "yes" when Perry asked for permission to search his black Nike duffel bag. [Tr. 245, 261] The Court finds that Defendant's consent was unequivocal, specific, and freely given.

Defendant did testify that he had difficulty understanding Perry's Spanish. [Tr. 240, 257, 261, 272-73] In cases in which the defendant has trouble speaking and understanding the language of the encounter, the Tenth Circuit holds that the standard is whether there is a "working knowledge" of the language, so that the defendant can understand and respond to the officer's questions. *Zubia-Melendez*, 263 F.3d at 1163; *United States v. Pulido-Vasquez*, 311 Fed. App. 140, 144 (10th Cir. 2009) (unpublished). The existence of some difficulty and confusion does not prevent this standard from being met. *Zubia-Melendez*, 263 F.3d at 1163. In this case it was Agent Perry who had some difficulty with the language of the encounter. The Court finds, however, that Perry had a working knowledge of Spanish sufficient to enable Perry and Defendant to "converse sufficiently to understand one another." *Id.* [Tr. 31-32] This conclusion is supported by the fact that Defendant responded appropriately to Perry's questions.

[Tr. 128-29]  *See Pulido-Vasquez*, 311 Fed. Appx. at 144; *United States v. Gamez-Acuna*, 375 Fed. Appx. 809, 815 (10th Cir. 2010) (unpublished).  Perry testified that the only time Defendant's response did not clearly indicate he understood was when Perry asked Defendant's destination and Defendant just handed over his bus ticket.  [Tr. 128]  But at the evidentiary hearing, Defendant himself explained that this was not a difficulty in understanding Perry's question; instead, Defendant testified that he handed his ticket to Perry instead of answering verbally because Defendant did not know how to pronounce "Fort Wayne."  [Tr. 235]  Further evidence of sufficient understanding is the fact that, in the conversation on the bus, Defendant never said he did not understand something.  *See Pulido-Vasquez*, 311 Fed. Appx. at 144; *Gamez-Acuna*, 375 Fed. Appx. at 815.  And in a conversation between Perry and Defendant at the DEA office, after Defendant was arrested and with an interpreter present, Defendant confirmed that he had understood Perry's conversation with him when they were on the bus.  [Tr. 267, 271-73]

The Court finds that there was sufficient understanding between Perry and Defendant. Language difficulties did not prevent Defendant from giving valid consent to each of Perry's requests.

Defendant contends that his consent was the product of coercion because:  (1) Perry had most likely pre-searched Defendant's bag and therefore acted in a "way that left [Defendant] no choice but to concede"; and (2) the circumstances of the interdiction procedure were intimidating and coercive.  [Doc. 28, pp. 11-14]

The first contention is a claim that an illegal pre-search caused Perry's manner to be coercive, so that a reasonable person would not have felt free to refuse consent.  Defendant asserts:  Perry's manner showed that Perry "clearly expressed an intent to search"; Perry "was

36

determined to search" Defendant's bag; and Perry "demanded permission to search."   [Doc. 28, pp. 11, 14]  The Court disagrees.  The Court finds that:  Perry requested consent at each step in the encounter, beginning with a request for permission to speak with Defendant; Defendant agreed to speak with Perry; Perry did not raise his voice; Perry gave no commands and made no threats; Perry spoke in a normal, quiet tone of voice and was polite, calm, and respectful; Perry used no force and did not block Defendant in; and the total encounter with Defendant took less than two minutes.  *See United States v. Thompson*, 546 F.3d 1223, 1228 (10th Cir. 2008) (observing importance of officer's not using antagonistic tone).   The fact that Perry asked permission at each step—including the initial request for permission to even speak to Defendant—indicated to a reasonable person that he was free to refuse consent.  *See Drayton*, 536 U.S. at 206-07.  The Court finds that Perry's manner was neither intimidating nor coercive.

At the evidentiary hearing, Defendant testified that he felt compelled to consent.  [Tr. 248-49]  The standard for voluntariness, however, is objective.  *Cardenas-Alatorre*, 485 F.3d at 1118.  The question is "whether a reasonable law enforcement officer would have understood" that the defendant consented.  *Flores*, 48 F.3d at 468-69; *see Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  "'The focus is not whether [one] subjectively consented, but rather, whether a reasonable officer would believe consent was given' as 'inferred from words, gestures, or other conduct.'"   *United States v. Lopez-Carillo*, 536 Fed. Appx. 762, 768 (10th Cir. 2013) (unpublished) (quoting *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)).  Based on the totality of the circumstances, the Court rejects Defendant's claim that Perry's manner was coercive and left Defendant no choice but to consent.

The second contention is that consent was coerced by the circumstances of the interdiction procedure. Two important cases concern bus encounters very similar to the one in this case.

In *Drayton*, the Supreme Court held that the "Fourth Amendment permits police officers to approach bus passengers at random to ask questions and to request their consent to searches." *United States v. Drayton*, 536 U.S. 194, 197 (2002). "The proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* at 202 (quoting *Florida v. Bostick*, 501 U.S. 421, 436 (1991)).

In *Drayton*, three officers dressed in plain clothes, and carrying concealed weapons and visible badges, boarded a bus at a scheduled stop after passengers had been required to disembark while the bus was cleaned and refueled. *Id.* at 197. One officer knelt on the driver's seat, facing backward and not blocking the aisle or the bus exit. The other two went to the rear, where one remained while the other worked his way toward the front of the bus, asking passengers their travel plans and trying to match overhead luggage with passengers. The officer did not inform passengers of their right to refuse to cooperate. The officer obtained consent to search the defendants' bag, and then to search their persons, where he found bundles of cocaine. *Id.* at 199. The Court concluded that the officers did not seize the bus passengers by boarding the bus and questioning passengers. *Id.* at 203. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Id.* at 201. The proper focus in determining whether the police conduct is coercive does not involve the natural confinement one experiences when choosing to take a bus, but instead "'whether a reasonable person would feel free to decline the officers' requests or otherwise

terminate the encounter.'"  *Id*. at 202 (quoting *Bostick*, 501 U.S. at 436).  The "reasonable

person" test is objective, and "'presupposes an *innocent* person.'"  *Id*. (quoting *Bostick*, 501 U.S.

at 437-38).

The *Drayton* Court concluded that the officers did not seize the bus passengers, and there

was nothing coercive or confrontational about the encounter.  *Id*. at 203-04.  "The officers gave

the passengers no reason to believe that they were required to answer the officers' questions."  *Id.*

at 203.   *Drayton* lists a number of important grounds to conclude that the encounter was

consensual rather than coercive:

> There was no application of force, no intimidating movement, no overwhelming
> show of force, no brandishing of weapons, no blocking of exits, no threat, no
> command, not even an authoritative tone of voice.  It is beyond question that had
> this encounter occurred on the street, it would be constitutional.  The fact that an
> encounter takes place on a bus does not on its own transform standard police
> questioning of citizens into an illegal seizure.

*Id*. at 204.  The Court rejected the contention that officers requesting consent for a search must

always inform citizens of their right to refuse; instead, the totality of the circumstances must

control "without giving extra weight to the absence of this type of warning."  *Id.* at 206-07.

"'While most citizens will respond to a police request, the fact that people do so, and do so

without being told they are free not to respond, hardly eliminates the consensual nature of the

response.'"  *Id*. at 205 (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)).  The Court held that

the respondents had not been seized illegally.

For similar reasons, *Drayton* held that the defendants' consents to search were uncoerced

and voluntary.  *Id.* at 206.  The officer did not indicate a command to consent to the search, but

instead asked permission to search the respondents' luggage and persons—which indicated to a

reasonable person that he was free to refuse consent.  *Id*. at 206.  The Court concluded that the

totality of the circumstances indicated that the respondents' consent was voluntary and the searches were therefore reasonable. *Id*. at 207.

In *Tapia*, the Tenth Circuit applied *Drayton* and held that the defendant's consent to search his luggage was not the product of an illegal detention. *United States v. Tapia*, 309 F.3d 1283 (10th Cir. 2002). While a Greyhound bus was being serviced at a terminal, officers conducted a canine sniff on luggage in the lower baggage compartment; the dog alerted to a box. *Id.* at 1285. After passengers reboarded the bus, three officers boarded; they wore plain clothes but had badges displayed and carried concealed weapons. *Id*. One officer announced, in English, to the bus passengers as a whole, that the officers would like to speak with passengers if it was okay with the passengers. The defendant was not informed that he was not required to speak with the officers or to consent to their requests. *Id*. at 1286-87. One officer contacted the defendant, in Spanish, and the defendant handed over his ticket—first removing a baggage claim ticket, but then giving it to the officer when asked what it was. *Id.* at 1286. The claim ticket was for the box to which the canine alerted; the officer requested and received consent to search that box, and found methamphetamine. *Id.* The Tenth Circuit concluded that the circumstances were substantially similar to the facts in *Drayton* and led to the same conclusion—that there was no illegal seizure when the defendant was questioned on the bus and that his consent to search the box was valid. *Id.* at 1288-89.

Consideration of Defendant's case shows that the facts and circumstances are substantially similar to *Drayton* and *Tapia*, and lead to the same conclusion. The Court will conclude that there was no illegal seizure and that the circumstances of the interdiction procedure were not coercive. Defendant's consent was given without duress or coercion.

As in *Drayton*, Perry and Walsh wore plain clothes and carried concealed weapons. Defendant never saw a weapon on Perry, as Defendant himself testified. [Tr. 247] *See Drayton*, 536 U.S. at 205 (observing that even if a holstered firearm is observed, that "is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon).

As in *Drayton*, Walsh's presence at the front of the bus did not contribute to a coercive environment. *See Drayton*, 536 U.S. at 205. Neither Perry nor Walsh did anything to intimidate passengers or block them from exiting. *See id.*; *INS v. Delgado*, 466 U.S. 210, 219 (1984) (holding that presence of several uniformed INS officers at factory exits did not result in seizure). And there were three officers on the bus in *Drayton* and *Tapia*, compared to only two in this case. The Court finds that there was no "threatening presence" of several officers.

Defendant's Motion asserts that Perry was "waiting right beside [Defendant's] bag when passengers began the reboarding process," suggesting that this position was intimidating and showed that Perry focused on Defendant. [Doc. 28, pp. 11-13] But the Court finds, instead, that Perry had already spoken with two to five other passengers who had already boarded and were seated in the rear of the bus. [Tr. 27-29] Perry was following his customary procedure in approaching the passengers in the back half of the bus, starting at the rear. Since Defendant was toward the back of the line for reboarding, Perry had already conducted encounters with two to five other passengers and had already asked them for consent to search their luggage and their persons for contraband. [Tr. 236, 27-29] After Defendant reboarded and sat down, four or five rows from the back, Perry approached Defendant. [Tr. 29, 106] The Court finds that Perry did not focus on Defendant, but approached all passengers in the rear half of the bus. The fact that Perry may have been near Defendant's seat by the time Defendant reboarded was a consequence

of Defendant's being one of the last to reboard—not of any focusing on Defendant or the owner of that black Nike duffel bag.

Walsh stayed in the front half of the bus, and was not near Defendant during Perry's encounter with Defendant.  [Tr. 157]  Even the presence of two agents on the bus was not coercive.  *See Zapata*, 997 F.2d at 758-59.  But, in addition, one of those two agents was not even near Defendant at the time of the encounter, further reducing any coercive or intimidating effect. *See Chavira*, 467 F.3d at 1291; *Cardenas-Alatorre*, 485 F.3d at 1120.

Perry's manner and tone of voice were not intimidating or coercive.  Perry asked permission at each point in the encounter.  *See Drayton*, 536 U.S. at 206.  As in *Drayton*, Perry spoke in a polite, quiet voice; Perry made no threats, no commands, and did not even use "an authoritative tone of voice."  *Drayton*, 536 U.S. at 204; *see Thompson*, 546 F.3d at 1228 (observing importance of officer's not using antagonistic tone).  The fact that the CD of Walsh's encounters does not contain Perry's voice indicates that Perry did not raise his voice and that there was no argument or confrontation during Perry's encounter with Defendant.  [Exhibit 2; Tr. 154]  In addition, Walsh testified that he did not hear any of Perry's encounter with Defendant— did not hear any commands given, did not hear Perry raise his voice, and did not see Perry use any type of force.  [Tr. 156]  Walsh testified that Perry customarily speaks very politely.  [Tr. 166-67]  Defendant himself testified that Perry never raised his voice.  [Tr. 246]

Perry made no misrepresentation about the nature of his investigation.  *See Harrison*, 639 F.3d at 1278-79 (stating that whether there is any misrepresentation is one factor to consider regarding coercion or duress).  Perry asked for permission to search "for contraband" each time. [Tr. 35-39]

Perry stood to the rear of Defendant's seat when he spoke to Defendant, to ensure that Perry did not block Defendant's way out of the bus.  [Tr. 29]  *See Drayton*, 536 U.S. at 204. Defendant testified that he felt pressured by Perry because Perry was leaning very close to him, practically on top of Defendant, "like he's close enough to kiss me."  [Tr. 246-47]  But Perry's position was the same as that upheld as non-coercive in *Drayton*.  The officer in *Drayton* approached from the rear, leaned over a respondent's shoulder—with his face twelve to eighteen inches away from the respondent's face—and spoke in a voice just loud enough for the respondents to hear.  *Drayton*, 536 U.S. at 198.  There was no more blocking or confining of Defendant than was inevitable, given the space constraints on a bus.  *See Drayton*, 536 U.S. at 201-02; *Bostick*, 501 U.S. at 436; *United States v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000) (recognizing that space constraints were inherent aspect of defendant's chosen mode of transportation and there was no evidence agent's conduct or position on bus conveyed message compliance with agent's requests was required).

Defendant testified that Perry asked him for identification, which Defendant gave him, and which Perry gave back after holding it briefly.  [Tr. 239, 253, 257]  Perry testified that he sometimes asks for identification, but did not testify that he did so with Defendant.  [Tr. 16] Asking for identification during a consensual encounter is permissible.  *See United States v. Madden*, 682 F3d 920, 925 (10th Cir. 2012).  When Defendant handed his bus ticket to Perry, although Perry had not asked for it, Perry also returned it within a very short time.  Perry did not retain Defendant's identification or ticket; these factors suggest that the encounter was consensual.  *See Thompson*, 546 F.3d at 1226; *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005); *United States v. Chavez*, 429 Fed. Appx. 807, 812-13 (10th Cir. 2011) (unpublished).

Perry did not explicitly advise Defendant that Defendant did not need to answer questions or consent to searches. But the Supreme Court held that the lack of an explicit warning to passengers that they may refuse to cooperate is not required in order for an encounter to be consensual. *Drayton*, 536 U.S. at 203; *see Tapia*, 309 F.3d at 1288. The district court in *Drayton* held the consents were voluntary, but the Eleventh Circuit reversed on the ground that "bus passengers do not feel free to disregard police officers' requests to search" absent a warning that passengers may refuse to cooperate. *Drayton*, 536 U.S. at 200. The Supreme Court held that the Eleventh Circuit "erred in adopting this approach." *Drayton*, 536 U.S. at 203. As in *Drayton*, Perry "gave the passengers no reason to believe that they were required to answer [Perry's] questions." *Drayton*, 536 U.S. at 203. Knowledge of the right to refuse consent is one factor to take into account, but Defendant's knowledge need not be established "'as the *sine qua non* of an effective consent.'" *Drayton*, 536 U.S. at 206-07 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)); *see Tapia*, 309 F.3d at 1288. Instead, the totality of the circumstances controls—"without giving extra weight to the absence of this type of warning." *Drayton*, 536 U.S. at 207; *see Thompson*, 546 F.3d at 1228 (holding that officer is not required to advise defendant he was free to leave or to disregard officer's questions, and lack of such advice "should carry little weight in our analysis").

Although Perry did not explicitly inform Defendant that he could refuse to cooperate or refuse to consent to a search, Perry did ask for Defendant's permission to talk to him at the beginning, and also asked permission for each search. As the Court observed in *Drayton*, the fact that Perry asked permission indicated to a reasonable person that he was free to refuse. *Drayton*, 536 U.S. at 206-07.

44

As in *Drayton*, it is "beyond question that had this encounter occurred on the street, it would be constitutional." *Drayton*, 536 U.S. at 204. The fact that the encounter instead took place on a bus did not "on its own transform standard police questioning of citizens into an illegal seizure." *Drayton*, 536 U.S. at 204. Because many other passengers were present to witness the agents' conduct, a reasonable person in Defendant's position might "feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." *Drayton*, 536 U.S. at 204. The presence of other passengers suggests that the encounter was consensual. *Thompson*, 546 F.3d at 1227; *see Zapata*, 997 F.2d at 757.

Perry's encounter with Defendant was brief, lasting at most two minutes.

The Court observes that the issue here requires application of "the fact-specific and broad nature of a 'totality of circumstances' test." *Tapia*, 309 F.3d at 1284. The test is an objective one—what the agents' conduct would communicate to a reasonable innocent person. *Bostick*, 501 U.S. at 439; *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). In *Tapia*, the Tenth Circuit concluded that the circumstances were substantially similar to the facts in *Drayton* and led to the same conclusion—that there was no illegal seizure when the defendant was questioned on the bus and that his consent to search the box was valid. *Tapia*, 309 F.3d at 1288-89. Comparing the interdiction conducted by Perry and Walsh to the procedures at issue in *Drayton* and *Tapia*, the Court finds that the same conclusion is appropriate in this case: Defendant was not illegally seized when Perry asked for consent, Perry's encounter with Defendant was consensual, and Defendant's consent was not coerced by the circumstances of the interdiction procedure.

Defendant attempts to distinguish his case from *Drayton* and *Tapia*, contending that Defendant was targeted. Defendant asserts that Perry was waiting right by Defendant's seat

when Defendant reboarded, and that Perry and Walsh displayed "keen focus on two distinct passengers and disinterest in everyone else."  [Doc. 28, pp. 12-13]  But the Court has rejected these attempts to demonstrate targeting, finding that the facts do not support Defendant's assertions.

Considering the totality of the circumstances, the Court concludes that Defendant's consent was uncoerced and voluntary.  Defendant's consent to the search of his black Nike duffel bag included consent to search any containers inside the bag that could hold narcotics.  *United States v. Jackson*, 381 F.3d 984, 988 (10th Cir. 2004).  Perry had asked whether he could search the bag for contraband and Defendant said "yes."  [Tr. 39]  Since the small zipper bag was a container that could hold contraband, Defendant's consent included consent to search inside that small zipper bag.  Defendant neither limited the scope of his consent nor objected when Perry pulled out and opened the small zipper bag inside; these are indications that Perry's search was within the scope of Defendant's consent.  *See id*.

The search of Defendant's black bag was therefore reasonable, because it was performed pursuant to valid consent.

**B.  Fruit of the poisonous tree**

The Court recognizes that Defendant's claim that the heroin should be suppressed as the product of illegality requires it to determine that the consent was not tainted by illegality, in addition to finding that Defendant's consent was voluntary.  *See Reeves*, 524 F.3d at 1170; *Melendez-Garcia*, 28 F.3d at 1053.  The Government bears the burden of demonstrating that there was no taint because there was a break in the causal connection.  *See Reeves*, 524 F.3d at 1170.

There is no claim, and no evidence, in this case that Defendant had any knowledge of any pre-search of his luggage.  Even if such a pre-search were proved, therefore, it could have had no coercive effect on Defendant; Defendant could not be coerced into giving consent by something of which he had no knowledge.

But the heroin could still be suppressed as fruit of the poisonous tree if information gained from an illegal pre-search affected or motivated Perry's decision to approach Defendant and ask the questions he did, including the request to search Defendant's black Nike duffel bag. *See Murray*, 487 U.S. at 540, 542; *Hernandez*, 279 F.3d at 309-10.  As discussed above, the Court finds that Perry approached and questioned Defendant according to his customary interdiction procedure of approaching and questioning all passengers; the Court finds that, assuming arguendo there was an illegal pre-search, such a pre-search did not motivate or affect Perry's decision to approach and question Defendant as he did.  *See Siciliano*, 578 F.3d at 69 (holding that it is a question of fact whether unlawfully acquired information motivated agent's conduct); *Hernandez*, 279 F.3d at 309 (recognizing that determination of what motivated agent to approach and question defendant constituted factual finding).  Even if there were an illegal pre-search, it made no difference.  *See Hernandez*, 279 F.3d at 309.  Since any illegal pre-search had no effect on the encounter, the consent obtained from Defendant "is not the product of illegality" and the heroin is not subject to exclusion.  *See Murray*, 487 U.S. at 542 n.3.

## **CONCLUSION**

The Court concludes that Defendant's Motion should be denied.

**IT IS THEREFORE ORDERED** that *Defendant's Motion To Suppress* [Doc. 28] is

**DENIED.**


_____
**UNITED STATES DISTRICT JUDGE**